[No. 10322–6–III. Division Three. May 7, 1991.]

MERIDIAN MINERALS COMPANY, ET AL, *Appellants,* v. KING COUNTY, ET AL, *Respondents.*

*John W. Hempelmann, Alan L. Wallace,* and *Cairncross, Ragen & Hempelmann, P.S.; Kurt W. Kroschel, Daniel L. Kinerk,* and *Kurt W. Kroschel & Associates,* for appellants.

*Norm Maleng, Prosecuting Attorney,* and *Ann Schindler, Deputy,* for respondent King County.

*David Boerner,* for respondent Friends of Veazie Valley.

THOMPSON, J.—Burlington Northern Railroad Company (BNRR) and Meridian Minerals Company (Meridian) appeal a partial summary judgment of the Chelan County

Superior Court in favor of King County, its agency, King County Building and Land Development Division (BALD), and Friends of Veazie Valley (Friends). The trial court upheld a decision by BALD refusing to process a grading permit as submitted by Meridian. We hold the proposed use by Meridian was a prohibited enlargement of the nonconforming use and affirm the decision of BALD and the judgment.

All parties stipulated to the facts deemed pertinent for purposes of summary judgment. Basically, the facts stipulated to were those found by BALD and upon which BALD based its letter decision.[1] An agreed order incorporating the stipulation was entered with the trial court. For purposes of this appeal, all parties stipulated they would not assert any issues of fact.

The property at issue is located on the Enumclaw Plateau in King County. Sometime between 1905 and 1908, rock quarry operations commenced on the property, originally on that portion which constituted the railroad right of way. Between 1917 and 1958, when Northern Pacific Railway Company was the owner, approximately 500,000 cubic yards of rock was extracted. The amount of rock quarried varied significantly from year to year, with only 15,000 cubic yards being quarried between 1953 and 1959.[2] Removal was almost exclusively by rail. More than 98 percent of the quarried rock was used by Northern Pacific

---

[1]BALD's letter decision of May 25, 1988, contains numerous findings of fact and multiple exhibits. The parties stipulated the decision was based on evidence presented by Meridian and Friends, derived by BALD from King County files, and within the knowledge of BALD officials. Although BALD and Friends believed there were additional supporting facts in possession of BNRR and Meridian not then discovered which would support the decision, BNRR and Meridian stipulated they were immaterial for summary judgment purposes.

[2]This production figure was supplied to BALD by BNRR in 1972. A more recent affidavit submitted to BALD averred approximately 70,000 cubic yards were removed between 1956 and 1959, apparently for a railroad line change. BALD determined the 1972 submission was more accurate than the affiant's memory.

Railroad Company for constructing, repairing and maintaining its own railroad facilities. Approximately 1.2 percent was sold to governmental entities.

In 1958, the property and surrounding area were first zoned by King County resolution. The zoning classification was agricultural and quarrying was prohibited except by special permit. Since 1958, the quarry has operated as a nonconforming land use in an agricultural zone.

In 1971, BNRR owned the quarry. BNRR and adjacent owners applied to the King County Council for a rezone to permit "commercial" quarrying. In the rezone application, the railroad admitted the quarry had been used exclusively for its own use. In 1972, after completion of an areawide zoning study, BNRR's rezone application was denied.

An annual grading permit for operating the quarry as a nonconforming use was first required by King County in 1972. In 1980, BNRR and King County negotiated the conditions that were to apply to the grading permit. The negotiated conditions were applied each year thereafter when BNRR, and subsequently Meridian,[3] sought renewal. The conditions limited production, stockpiling, removing, blasting, and quarry use.[4]

In 1984, Meridian (then a subsidiary of BNRR) initiated a rezone of the property from agricultural to quarry mining or, alternatively, an unclassified permit for commercial quarry operations. BALD determined the proposed zoning

---

[3]The complaint alleges BNRR, a subsidiary of Burlington Northern, Inc., owns the quarry property and "seeks to alienate to Meridian the nonconforming land use". Meridian operates the mineral extraction site at the quarry and is the applicant on the 1988 grading permit which BALD declined to process in its letter decision.

[4]In a letter to BALD in connection with the 1980 conditions, BNRR's general counsel stated: "[BNRR] has no intention of attempting to expand the use of its [quarry] or to change the nature of the use *from a rail oriented rock quarry to a commercial quarry* without an appropriate zone change or conditional use permit. Nevertheless, we feel that the permit issued for our continuing operations should allow us the full exercise of our prior operating rights and the flexibility to maintain an adequate source of rock for each of the uses which we have historically supplied." (Italics ours.)

change required an environmental impact statement (EIS). An EIS was submitted and its adequacy challenged. The King County hearing examiner found the EIS inadequate and required a supplemental EIS. On appeal, the King County Superior Court upheld the hearing examiner's decision.

Shortly after the King County Superior Court decision, Meridian told BALD it was entitled to operate a commercial quarry without a zoning change. Its argument was based on the nonconforming use rights acquired before 1958. In response, BALD undertook review of the use established and maintained at the quarry before 1958, when the property was first zoned. BALD informed Meridian that regardless of the scope of its nonconforming use rights, a grading permit would still be required.

Meridian submitted an application for a new grading permit in April 1988. The application sought to mine and process 42,500 cubic yards of rock for 2 to 3 months followed by year–round sales: 17,500 cubic yards to be removed by truck (1,500 truck trips, average of 14 trips per day) and 25,000 cubic yards to be transported primarily by rail. Meridian contended BALD was without authority to enforce several of the "1980 conditions" in prior permits. To allow BALD time to review Meridian's permit and still continue quarry operations, BALD issued a permit with the same conditions as those imposed since 1980.

On May 25, 1988, BALD issued a letter decision directing its SEPA (State Environmental Policy Act of 1971) Center and its Grading Department not to process Meridian's application. BALD concluded the property could not be used in violation of the zoning code except in the same general way it was lawfully used before the zoning took effect. An extensive factual basis for the decision was set forth in the letter decision. Even though BALD concluded it could not issue a grading permit authorizing "commercial use", it agreed to modify prior grading permit conditions in several respects: as to blasting requirements, different conditions would be imposed if environmental review under

SEPA demonstrated they were environmentally acceptable; as to use of quarried rock, BALD expressed willingness to negotiate;[5] as to Meridian's desire to use a rock crusher, BALD stated if a factual showing were made it was a legitimate accessory use and if SEPA review showed environmental impacts could be controlled, use of the crusher would be authorized; as to production and stockpiling, BALD stated absent an emergency, no more than 10,000 cubic yards of material could leave the site annually[6] and no more than 40,000 cubic yards of rock could be produced and stockpiled on the site at any time;[7] as to transportation, increased removal by truck would be permitted if environmental review under SEPA demonstrated it was environmentally acceptable.

Without submitting a new permit application, BNRR and Meridian filed a complaint in Chelan County Superior Court[8] seeking a judgment declaring BALD's decision contrary to law and petitioning for writ of review and writ of

---

[5]BALD noted that BNRR's general counsel wrote the 1980 condition requiring that all quarried rock be principally for BNRR's use with casual sales and exchanges to others. BALD indicated its willingness to renegotiate this condition, but if it did, it would "make a fresh determination . . . of what 'casual sales' and 'exchanges' are within the scope of Meridian Minerals' nonconforming–use rights."

[6]BALD stated the 10,000–cubic–yard limitation was probably agreed to in 1980 because it reflected a reasonable historical average of the amount removed annually before 1958, and because it was more convenient for both King County and BNRR to work within a volume figure than to require BNRR to demonstrate each time the rock was removed that it was for railroad purposes.

BALD further explained that it "recognize[d] Meridian Minerals' nonconforming–use right to remove rock in a volume sufficient to meet its own railroad needs" and if Meridian preferred, it would "agree to remove the volume limitation and substitute a condition that requires Meridian Minerals to demonstrate that the rock it removes is actually to be removed for railroad purposes."

[7]BALD explained this condition was intended, in part, to reflect historical limits. More significantly, it was intended to minimize adverse environmental impacts.

[8]Pursuant to RCW 36.01.050, actions against any county may be commenced in the superior court of an adjoining county.

mandate requiring BALD to reconsider Meridian's permit application in conformity with the court's declaration. Friends' motion to intervene was granted. BNRR and Meridian moved for partial summary judgment ordering BALD to process Meridian's grading permit without restricting who may use the rock and to declare that BALD owed the moving parties certain specified duties.

On April 19, 1989, BNRR and Meridian's summary judgment motions were denied. The oral motions of King County and Friends, which sought a declaration that the letter decision was correct as a matter of law, were granted. In August 1989, after the summary judgment order was entered, Meridian filed a motion for reconsideration. CR 59(a)(7). BALD and Friends moved to strike affidavits and exhibits offered in support of reconsideration. The trial court granted the motion to strike, in part, and denied the motion for reconsideration. This appeal by Meridian and BNRR followed.

We first address Meridian's contention the trial court erred in barring additional evidence submitted in support of its motion for reconsideration.

Meridian offered 65 exhibits in support of its motion for reconsideration. The proffered exhibits included 53 historical documents delivered by Meridian's attorneys to BALD in 1988. Meridian argued its motion for reconsideration was based on CR 59(a)(7)[9] and additional facts could be submitted even if not newly discovered. King County argued the documents were only a part of the evidence examined by BALD before making its findings, and putting them in the record would be prejudicial, particularly in light of the stipulation the parties entered into for summary judgment purposes.

■ Although not encouraged, a party may submit additional evidence after a decision on summary judgment has

[9]CR 59(a)(7) provides for the vacation of a decision if "there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law;".

been rendered, but before a formal order has been entered. *E.g., Felsman v. Kessler,* 2 Wn. App. 493, 498, 468 P.2d 691, *review denied,* 78 Wn.2d 994 (1970). However, CR 59 does not indicate whether additional evidence may or must be considered in a CR 59(a)(7) motion, nor have we found a Washington case directly on point. *Holaday v. Merceri,* 49 Wn. App. 321, 330, 742 P.2d 127, *review denied,* 108 Wn.2d 1035 (1987) held when a motion for reconsideration is brought after a trial has been completed, the court must base its decision on evidence heard at trial. Certainly both a trial and a summary judgment hearing afford the parties ample opportunity to present evidence. Unless discovered after the opportunity passes, the parties should generally not be given another chance to submit additional evidence. In the context of a summary judgment, unlike trial, there is no prejudice to any findings if additional facts are considered. However, as King County asserts, the evidence offered by Meridian could be prejudicial because it was offered in disregard of the parties' stipulation. The stipulation states in relevant part:

> [F]or the purposes of this motion the parties agree and stipulate that plaintiffs' pending motion for partial summary judgment challenges only the legality of BALD's decision in light of the *facts found by BALD.*

(Italics ours.) Therefore, under the facts presented, we find the trial court did not err in excluding the additional evidence offered by Meridian. Our holding is consistent with the stipulation of the parties that, on appeal, they would not assert any issues of fact.

▮ BNRR and Meridian assign error to the denial of their motions for summary judgment and reconsideration. However, it is clear from the record the order denying the summary judgment motions was not a final, appealable order, and we will not address this contention further. As to the denial of Meridian's motion for reconsideration:

> Motions for reconsideration are addressed to the sound discretion of the trial court and will not be reversed absent a clear or manifest. abuse of that discretion. An abuse of discretion

exists only if no reasonable person would have taken the view adopted by the trial court.

(Citation omitted.) *Holaday*, at 324. Meridian has not shown any abuse of discretion.

■ We next address Meridian's contention that the diminishing assets doctrine applies in this state and bars restrictions on nonconforming mineral extractions. This contention can be summarily dismissed because the doctrine applies to *area* limitations, a limitation not at issue in this appeal.[10]

At the heart of this appeal is the question whether BALD erred in refusing to issue a grading permit allowing Meridian to intensify, enlarge, and expand its nonconforming land use.

Meridian and BNRR argue that, because the King County Code (Code) does not place any restrictions on intensifications, enlargements or expansions of nonconforming land uses, there can be none imposed by BALD. An administrative agency, they maintain, "has only those powers either expressly granted or necessarily implied from statutory grants of authority". *Green River Comm'ty College v. Higher Educ. Personnel Bd.*, 95 Wn.2d 108, 112, 622 P.2d 826 (1980), *adhered to and modified,* 95 Wn.2d 962, 633 P.2d 1324 (1981). BALD, however, is the agency responsible for administering King County's land use laws, including the county zoning code and grading ordinance. BALD has both express and implied authority to interpret

---

[10]Under limited conditions, courts have applied the diminishing assets doctrine to allow the extraction of minerals beyond the area where excavation existed at the time of zoning. *See* 6 P. Rohan, *Zoning & Land Use Controls* § 41.03[3][c], at 41–89 (1990). For example, the court acknowledged, but did not apply, the doctrine in *Stephan & Sons, Inc. v. Anchorage Zoning Bd. of Examiners & Appeals*, 685 P.2d 98, 56 A.L.R.4th 761 (Alaska 1984). In *Stephan,* Anchorage had restricted gravel pit operations to 13 acres of an owner's 53–acre parcel. The court upheld the restriction, finding the operation by the prior owners was not indicative of an objective intent to appropriate the entire parcel to gravel pit operations. Although the court acknowledged the diminishing assets doctrine, it held the determining factor in allowing area increases was the owner's intention. Meridian cites no Washington authority for its contention.

the Code and determine conditions to be imposed on grading permits. Whether BALD has properly interpreted the Code is the issue.

The Code defines a nonconforming use as follows:

"Nonconforming use" means a use which was lawfully established and maintained but which, because of the application of this title, no longer conforms to the use regulations of the zone in which it is located as defined by this title.

King County Code (KCC) 21.04.619. King County argues the Code is structured to allow only those uses specifically permitted in the zone where the use is located. Thus, unless specifically permitted, the use is prohibited. It cites KCC 21.06.120:

**Limitation of land use.** Except as provided in this title, no building or structure shall be erected, reconstructed or structurally altered, nor shall any building, structure or land be used for any purpose except as hereinafter specifically provided and allowed in the zone in which such building, land or use is located.

The property at issue is zoned agricultural. Quarrying is not a permitted use under the Code without an unclassified use permit.[11] Having previously failed in their attempts to obtain a Q–M rezone (*i.e.*, quarry mining) or unclassified use permit to operate a "commercial quarry", BNRR and Meridian seek such operation through the grading permit process.

■■ The Code contains "nonconforming use" exceptions as to buildings. There is no express provision relating to nonconforming uses as to land and hence no provision regarding variations in use (*e.g.*, expansion, enlargement, or intensification).[12] A literal interpretation of the Code would disallow any nonconforming land use. However, BALD has interpreted the Code to allow nonconforming land uses as

---

[11]The Code defines an unclassified use permit as "a limiting authority granted by the county and the documented evidence thereof to locate an unclassified use at a particular location, and which limiting authority is required to apply or modify the controls stipulated in [the Code]". KCC 21.04.900.

[12]An exception exists as to land having an assessed value of less than $100. KCC 21.52.090(A).

provided under the common law, *i.e.*, uses as they existed at the time of zoning. Meridian contends BALD must apply the Code's definitions and classifications of the type of use in question when determining nonconforming use rights.

Under *Bartz v. Board of Adj.*, 80 Wn.2d 209, 492 P.2d 1374 (1972), the severity of limitations in the phasing out of nonconforming uses is within the discretion of the legislative body. Zoning ordinances are to be read and considered in their entirety, and unreasonable and unrealistic constructions rejected. *Bartz*, at 218. It is reasonable to conclude that in adopting the Code, King County exercised its discretion by leaving to the common law the phasing out of nonconforming land uses. We thus begin our analysis of the common law governing nonconforming uses.

■ Phasing out nonconforming uses is a policy goal of zoning legislation. *Anderson v. Island Cy.*, 81 Wn.2d 312, 501 P.2d 594 (1972); *Bartz*. The reasons behind this policy were noted with approval in *Anderson*.

> It has been pointed out in several cases that the ultimate purpose of zoning ordinances is to confine certain classes of buildings and uses to certain localities; that since the continued existence of those which are nonconforming is inconsistent with that object, it is contemplated that conditions should be reduced to conformity as completely and as speedily as possible with due regard to the special interest of those concerned and that where suppression is not feasible without working substantial injustice, there shall be accomplished the greatest possible amelioration of the offending use which justice permits; and that the generally accepted method of accomplishing this result is to prevent any increase in the nonconformity and, when changes in the premises are contemplated by the owner, to compel, so far as is expedient, a lessening or complete suppression of the nonconformity.

*Anderson*, at 323 (quoting Annot., *Zoning: Changes, After Adoption of Zoning Regulations, in Respect of Nonconforming Existing Use*, 147 A.L.R. 167, 168 (1943)).

In *Anderson*, an interim zoning ordinance was adopted at a time when gravel operations were being conducted on property being zoned. The owners wanted to operate a cement batching plant on their property after the zoning

went into effect. They asserted such operations were the reason for purchasing the property. The Island County commissioners passed an amendment changing the residential zone to a commercial zone to permit the change in use. On appeal, the court held even if the use (cement batching) had been in existence at the time zoning was adopted, when the Island County commissioners granted an extension of the nonconforming use with intent to accommodate expansion, it was contrary to the public interest and constituted arbitrary and capricious action. The nonconforming use was "an activity inconsistent with the reasoned planning of the county zoning authorities". *Anderson,* at 323.

More recently, *Keller v. Bellingham,* 92 Wn.2d 726, 730, 600 P.2d 1276 (1979) reiterated "the spirit of zoning measures is to restrict the extension of nonconforming uses as exemplified in *State ex rel. Miller v. Cain,* [40 Wn.2d 216, 242 P.2d 505 (1952)]". *Keller* also cautioned that enactments in derogation of the common law (*i.e.,* zoning ordinances) must be strictly construed. In *Keller,* plaintiffs sought a declaration that the addition of six electrolytic cells to the production line of a chlorine manufacturing plant was an invalid enlargement of a nonconforming use under the *Bellingham City Code.* The city code did not specifically prohibit intensification of a nonconforming use by reference to volume. Unlike the case at bar, officials charged with enforcing the Bellingham City Code did not construe the code as prohibiting use intensification. *Keller* accorded the official decision "considerable judicial deference". The court then split 5 to 4, finding there had been a permissible intensification, not a prohibited enlargement, of the nonconforming use.[13]

■ A nonconforming use is defined in terms of the use of the property lawfully established and maintained *at the time* zoning was imposed. KCC 21.04.619. *See also Keller,*

---

[13]The Bellingham City Code provided that a nonconforming use "shall not be enlarged, relocated or rearranged". *Keller,* at 728.

at 731. The existing use must have been more than intermittent or occasional. 1 R. Anderson, *Zoning* § 6.32, at 550 (3d ed. 1986). At the time King County zoned the property (1958), the activity appears sufficient to establish an existing quarry use.

As acknowledged in *Keller,* nonconforming uses do not always remain static. *Keller,* at 731 (citing 1 R. Anderson, *Zoning* § 6.47 (2d ed. 1976)). The issue thus arises as to the extent changes in a nonconforming use are tolerated without requiring a rezone or conditional use permit. Meridian and BNRR contend the uses permitted under the Code for property zoned to allow "mineral extraction" set the limits of its use. Meridian contends BALD disregarded the Code definitions of "quarrying" and "commerce". For example, Meridian argues, the Code definition of "commerce" does not require sales on the open market and "quarrying" is simply "mineral extraction". King County argues Meridian's assertion ignores the plain meaning of the Code. We agree with King County.

If King County intended to permit unlimited expansion of nonconforming land uses, it could have done so. If quarrying were the appropriate use for the property, the Code would have "allowed" it by classifying the area "Q–M" (quarry mining), KCC 21.42, not "agricultural", KCC 21.22. The agricultural classification was first imposed in 1958 and, in spite of rezone attempts and after at least one areawide study, the agricultural classification remains. The construction advocated by Meridian would have the effect of automatically zoning all nonconforming land uses consistent with their nonconforming status. Since the Code does not permit quarrying in an agricultural zone, definitions as to "mineral extraction" and "quarrying" contained in the Code are irrelevant to, or at least not determinative of, the scope of a nonconforming use.

We find that BALD's interpretation of the Code rested on a sound basis and accordingly give it substantial weight. BALD, through its manager, had the power under

the Code to administer and interpret the Code and grading ordinance. KCC 2.16.050.

> It is a well established rule of statutory construction that considerable judicial deference should be given to the construction of an ordinance by those officials charged with its enforcement.

*Mall, Inc. v. Seattle,* 108 Wn.2d 369, 377–78, 739 P.2d 668 (1987).[14]

 Unlike many cases cited to us by the parties, Meridian is not seeking to transform the general "type of activity" for which the land is used.[15] That is, the nonconforming use is quarrying and the proposed use is quarrying. Yet, we cannot deny that significant changes are being proposed by Meridian, notably in terms of production volume and the attendant increases in blasting and transporting. *Keller* is instructive on this issue.

> When an increase in volume or intensity of use is of such magnitude as to effect a fundamental change in a nonconforming use, courts may find the change to be proscribed by the ordinance. Intensification is permissible, however, where the nature and character of the use is unchanged and substantially the same facilities are used. The test is whether the intensified use is *"different in kind"* from the nonconforming use in existence when the zoning ordinance was adopted.

---

[14]In *Phillips v. Seattle,* 111 Wn.2d 903, 908, 766 P.2d 1099 (1989), the court referred not to "judicial deference", but the "great weight" that should be given "the construction of the statute by the administrative body whose duty it is to administer its terms".

Meridian argues that BALD was not simply deciding facts, it was primarily making a decision about the law. *Condit v. Lewis Refrigeration Co.,* 101 Wn.2d 106, 676 P.2d 466 (1984); *Overton v. Economic Assistance Auth.,* 96 Wn.2d 552, 555, 637 P.2d 652 (1981). The final determination whether a zoning code prohibits a land use, argues Meridian, is a question of law for the courts. *Mercer Island v. Kaltenbach,* 60 Wn.2d 105, 371 P.2d 1009 (1962). We agree. While we have given great weight to BALD's construction of the Code, particularly as to definitions, intent, and the statutory scheme, to the extent BALD interpreted what scope is accorded a nonconforming use under the common law, no such judicial deference has been accorded BALD's construction.

[15]We are directed to the Code definition of use by Meridian: "'Use' means . . . the type of activity . . . to which land is devoted or may be devoted." KCC 21.04.910.

(Citations omitted. Italics ours.) *Keller,* at 731. Since a nonconforming use can be continued only if similar in kind to the use existing at the time zoning became effective, we conclude each case must be assessed on its facts, within due process standards, and in light of the disfavored nature of nonconforming uses.

Here, the quarry was used almost exclusively for railroad purposes at the time zoning became effective (*i.e.,* 1958). During the entire 40–plus years before zoning, less than 500,000 cubic yards of rock had been produced. As little as 15,000 cubic yards had been produced between 1953 and 1959. The extracted rock was moved primarily by railroad on a seasonal basis. Meridian's 1988 application for a grading permit sought the mining and processing of 42,500 cubic yards of rock in 1988, an amount approximately 3.4 times the annual average over the last 40 years. Meridian proposed year–round sales, an estimated 14 truck trips per day, and the removal of 25,000 cubic yards by rail. We find that Meridian's proposed intensification is different in kind from that which existed in 1958 and would constitute a prohibited enlargement of the nonconforming use. The nature and purpose of the original use would change with the proposal and would have a substantially different impact and effect on the surrounding area.

We next turn to the more perplexing question of whether BALD could impose a "railroad purpose" restriction on quarry operations. Meridian and BNRR argue such restriction is an unreasonable restraint on alienation. They call to our attention the fundamental principle of zoning: to regulate the use of property without regard to ownership.

There are no Washington cases cited by BNRR or any other party which support, or refute, BNRR's contention that BALD's restriction would constitute an unreasonable restraint on alienation.[16] BNRR refers us to cases outside

---

[16]BNRR cites a footnote in *Olympia v. Palzer,* 42 Wn. App. 751, 754 n.3, 713 P.2d 1125, *aff'd,* 107 Wn.2d 225, 728 P.2d 135 (1986) which states: "Our research has failed to disclose a single case within the 50 states in which a court has upheld

this jurisdiction. In *Soho Park & Land Co. v. Board of Adj.*, 6 N.J. Misc. 686, 142 A. 548 (Sup. Ct. 1928), a city board of adjustment imposed, as a condition of a building permit, the requirement the building be occupied only by a specified party (*i.e.*, the National Harris Wire Company) *and* be used solely as a wire factory. The New Jersey Supreme Court held the condition invalid as a restraint upon alienation because it restricted ownership to the current property owner. In *Coventry v. Glickman*, 429 A.2d 440 (R.I. 1981), the federal government sought approval to sell lots in its nonconforming housing project to private persons. The project was nonconforming due to zoning density requirements. The Town of Coventry refused approval, primarily on the basis that the use had been discontinued, although it also argued that sales to private persons rather than public employees was a prohibited enlargement of nonconforming use rights. The Rhode Island Supreme Court ruled in favor of the federal government based, in part, on its right to alienate property interests. We find the cited cases unpersuasive.

▋ In response *to* arguments regarding unreasonable restraint on alienation in the instant case, the trial court concluded there was no unlawful restraint. We agree, and adopt the trial court's reasoning:

> [BNRR and Meridian] are treated like any other holder of a nonconforming use. The nature and extent and scope of their nonconforming use is defined—in all cases is defined by the use that the property was put to prior to the zoning that went into effect, and the Court can find no violation of alienation of the property. They can sell their property. In fact, it's my understanding they have sold it or at least transferred it to Meridian[17] and they've obtained it from Northern Pacific with the same rights that they had.

---

a zoning ordinance restraining alienation." However, our research indicates few courts have analyzed zoning ordinances using the doctrine of unreasonable restraints on alienation. Typically, such analysis is limited to restraints contained in contracts and real property conveyances between private entities.

[17]The complaint alleges Meridian operated the mineral extraction site located at the quarry and BNRR sought "to alienate to Meridian the nonconforming land

They can still market their land according to the zoning as agriculture, but they cannot transfer to a buyer any more rights than they have and their rights are limited by what use they made of the property prior to that date.

Meridian and BNRR also contend the Code is being applied retroactively. The opposite is true. The doctrine of vested nonconforming uses arose from the reluctance of courts to give zoning ordinances retroactive effect which would destroy existing use rights. *See* 4 A. Rathkopf, *Zoning and Planning* § 51.01[1], at 51–4, 51–5 (1983). BALD's decision acknowledges the nonconforming use and *exempts* it from the operation of the Code. If it had not done so, any nonconforming use would have been prohibited. A statute is not applied retroactively merely because it draws upon antecedent facts for its operation. *Aetna Life Ins. Co. v. Washington Life & Disab. Ins. Guar. Ass'n,* 83 Wn.2d 523, 535, 520 P.2d 162 (1974); *Bates v. McLeod,* 11 Wn.2d 648, 654, 120 P.2d 472 (1941). Here, BALD utilized historical data and facts about the quarry before the Code went into effect. The data and facts determined the scope of the use permitted prospectively under the Code.

We next address BNRR's and Meridian's contention the expansion of a nonconforming land use is a constitutional right.

Washington courts have acknowledged property owners "are not without some rights in the continuance of a legitimate business . . . despite a change in zoning". *State v. Thomasson,* 61 Wn.2d 425, 428, 378 P.2d 441 (1963). As a general proposition, due process prevents the abrupt termination of what one had been doing lawfully. The protection does not generally extend beyond this purpose. *Baxter v. Preston,* 115 Idaho 607, 768 P.2d 1340 (1989). If a zoning authority seeks to *immediately abolish* a nonconforming use, it must show "a condition substantially detrimental to the public health, safety, morals or welfare . . ." in order to pass due process scrutiny. *Thomasson,* at 428.

---

use rights . . .". BNRR's and Meridian's argument that because that use is alienable it somehow expands or permits a change in the use is a non sequitur.

If BALD were attempting to immediately abolish the quarry, *Thomasson* would require a showing that quarrying at the site was detrimental to the public health, safety, morals or welfare. Such is not the case. Under *Anderson,* a nonconforming use is permitted to avoid severe detriment to the owner, but the *phasing out* of the use justifies the invoking of the police power because "its existence is disfavored as inconsistent with the comprehensive plan, and therefore in conflict with the interests and welfare of the community." *Anderson v. Island Cy.,* 81 Wn.2d 312, 324, 501 P.2d 594 (1972). *See also State ex rel. Miller v. Cain,* 40 Wn.2d 216, 242 P.2d 505 (1952). King County determined the area in which the quarry is located should be zoned agricultural. Neither Meridian nor BNRR have argued the agricultural zoning is not within the best interests and welfare of the community.

BNRR cites *Burien Bark Supply v. King Cy.,* 106 Wn.2d 868, 725 P.2d 994 (1986) as authority for its due process argument. As Friends contend, *Burien* does not support BNRR's contention. It addressed vagueness in a section of a zoning code prescribing what uses were permitted. *Burien* held the due process requirement of *fair warning* is violated when a legislative enactment is vague. Neither BNRR nor Meridian specifically assert that the Code is vague and a question of "fair warning" is not presented. If the issue were whether quarrying is permitted in the agricultural zone and the Code is so vague that neither BALD nor a citizen could determine whether quarrying was a permitted use, *Burien* might be of assistance. Although BNRR argues BALD's restrictions on use of the rock for railroad purposes constitutes a denial of due process, BALD's decision does not rest on a "railroad purpose" distinction.

Finally, we address the contention of BNRR and Meridian that they are being denied equal protection because the scope of their nonconforming use is different from nonconforming uses at other quarries. BALD determined the scope of each nonconforming use is determined by the use lawfully established and maintained at the time the zoning

went into effect. There will be individual differences which result when the prior use is analyzed, but the legal standard is the same. There is no evidence the legal standard has not been applied to all holders of nonconforming uses.

The various owners of the Veazie Valley quarry have been allowed to continue a nonconforming use since 1958. That use can continue as long as it remains similar in kind to the use that became vested, the use at the time zoning occurred. Although railroad use of rock may have declined over the years and BNRR may be one of the last to need rock from the quarry, Washington has long adhered to the policy of phasing out nonconforming uses. *Anderson; Bartz; Coleman v. Walla Walla,* 44 Wn.2d 296, 266 P.2d 1034 (1954); *Cain.* The generally accepted method of eliminating nonconforming uses "is to prevent any increase in the nonconformity and, when changes in the premises are contemplated . . . to compel . . . a lessening or complete suppression of the nonconformity". *Anderson,* at 323 (quoting 147 A.L.R. 167, at 168). The use of the quarry, not its ownership, was at issue when BALD declined to process Meridian's permit application.

We hold BALD's decision was correct as a matter of law and affirm the judgment.

SHIELDS, A.C.J., and MUNSON, J., concur.