FILED
COURT OF APPEALS
DIVISION II

2013 JUL -2 AM 9: 07

STATE OF WASHINGTON

BY_____
      DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SARAH NICOL McDONOUGH, | No. 42885-7-II |
| Respondent, | |
| v. | |
| JOSIAH DANIEL CHRISTENSEN, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, P.J. – Josiah Daniel Christensen appeals the trial court's order modifying a parenting plan by limiting his visitation with his child based on domestic violence and its denial of his motion for reconsideration. He argues that the trial court erred in (1) finding a substantial change in circumstances, and (2) imposing limitations under RCW 26.09.191 based on a history of domestic violence. He also asks us to consider a new psychological/domestic violence evaluation that was not timely before the trial court for its consideration. We deny this request, affirm the parenting plan modification, and deny Sarah Nicol McDonough's request for attorney fees.

No. 42885-7-II

FACTS

I. MARRIAGE; DIVORCE; PARENTING PLAN

Josiah Daniel Christensen and Sarah Nicol McDonough[1] married in July 2006 in the United States. They moved to Guam, where Christensen was stationed in the Navy and where they bore a son in November 2007.

A. Domestic Violence Reports

During their marriage, McDonough twice reported domestic violence incidents, which the U.S. Naval Criminal Investigative Service (NCIS) investigated. She first reported an assault by Christensen when she sought medical treatment for bruising on her left arm on September 6, 2008. McDonough told the NCIS investigator that she had been subject to "two years of ongoing abuse by" Christensen. Clerk's Papers (CP) at 70. She described a specific instance of abuse that had occurred the preceding week when Christensen had "choked" her and "thrown [her] into an interior wall of their residence." CP at 69. McDonough also told the investigator that Christensen would regularly "spank[ ] her" when he arrived home and that he would strike her with wooden spoons and brushes before having sex; she had consented to this behavior "because she [wa]s afraid of" Christensen. CP at 71. McDonough admitted that she had struck Christensen in the past and that on one occasion she had bloodied his nose.

Christensen denied "intentionally assault[ing]" McDonough, asserted that she had injured herself in a fall, but he admitted that he had pushed her off of him and that they "landed to the ground during physical altercations . . . initiated by [McDonough]." CP at 70. Christensen

---

[1] McDonough remarried and changed her surname to Bennett before the trial in this matter. But for clarity in this opinion, we refer to her by her maiden surname, McDonough.

2

characterized the spankings as "foreplay," which McDonough "liked" "because she consented to the act." CP at 78. The NCIS report notes that "[b]oth [McDonough] and [Christensen] admitted to having numerous altercations that resulted in both individuals becoming physical." CP at 69. Christensen's command took no action against him; instead it requested counseling for the couple.

McDonough made a second report of abuse on December 24, 2008. She told the NCIS investigator that (1) on December 14, Christensen had choked her for refusing to have sex with him; and (2) on December 24, they had another argument about sex, during which he had grabbed her arm and threatened to break it. McDonough was treated at the military hospital for a swollen hand and released. Again, Christensen's command took no action against him; instead, it "decided that successful completion of Family Advocacy Program (FAP) for domestic violence was a suitable resolution." CP at 83.

A week later, on December 31, McDonough left Guam with their son. They lived with Christensen's parents in Washington from January 2009 until July 2009, when the Navy transferred Christensen to California. McDonough and Christensen reunited in California.

## B. Guam Divorce; Parenting Agreement

In April 2010, shortly after Christensen was deployed to Afghanistan, McDonough moved back to Washington and filed to dissolve the marriage. But when she and Christensen disagreed on custody issues[2] and Christensen informed her that she could not file for a divorce while he was stationed overseas, she withdrew the dissolution action. Soon after Christensen

---

[2] McDonough had sought sole custody.

3

returned to Washington, however, the couple filed for divorce in Guam. On September 15, a Guam superior court granted Christensen and McDonough a divorce on grounds of McDonough's adultery.

The Guam court also entered an agreed "Parenting Agreement," which gave each parent "joint legal custody" of their son, required joint decision making, and provided each parent with physical custody for two weeks each month; this parenting agreement, however, did not specify whether those two weeks were to be consecutive. CP at 17, 19. Nothing in the record shows that the Guam court was aware of any domestic violence allegations.

## C. CPS Report; Temporary Child Protection Order

McDonough discovered bruising on her son when he returned from a visit with Christensen. On or around December 8, 2010, she contacted Washington's Child Protection Services (CPS). In a December 9 letter, Sydney Doherty from CPS stated that a Dr. Yi had examined McDonough's son, "reported that she has a high suspicion for non-accidental trauma inflicted on [the child]," and expressed concern for the child's safety if he were to have a two-week visitation with Christensen. CP at 118. Doherty also "observed" the child's injuries and independently concluded that "they are unusual places to have bruising and they are not consistent with bruising you would see from usual toddler play." CP at 118. Doherty also found McDonough's report to Dr. Yi about Christensen's past violence toward her (McDonough) "concern[ing]." CP at 118. Despite that the investigation was still "ongoing," Doherty believed there was "enough evidence to indicate that [the child] was likely physically abused while in" Christensen's care. CP at 118.

4

Within the next week, on December 15, McDonough petitioned the Pierce County Superior Court for a protection order restraining Christensen from harming her and their son or contacting their son. In her supporting statement, McDonough (1) described the domestic violence incidents against her that she had previously reported during the NCIS investigations; (2) asserted that to obtain Christensen's consent to their Guam divorce, she "had to agree to a 'disciplining'" session in which he struck her with a broken hanger, a belt, a hairbrush, and a wooden paddle, leaving marks on her buttocks and upper thighs; (3) described additional assaults, including one in Guam during which Christensen had perforated her eardrum, and another on January 3, 2010, when Christensen had attempted to choke her in front of their son; (4) reported bruising on her son's body on December 6, after he returned from spending two weeks with Christensen; and (5) explained that she had reported these injuries to CPS, which was investigating. CP at 107. The superior court granted a temporary restraining order providing that Christensen could have only supervised visitation with his son for four hours every other day.

D. Petition for Parenting Agreement Modification; Lifting of Temporary Restraining Order

The next day, McDonough petitioned for modification of the Guam parenting agreement. McDonough's petition stated:

> I feel that for the safety and overall well being of our son . . . , that he have limited interaction with [Christensen]. [Their son] always comes back from his dad's with bruises from some sort of injury whether it was falling down the stairs or unexplained[.] I am very concerned for our son's safety and I have contacted CPS due to the abnormality of the bruises from this last visit with Josiah, I have provided documentation.

CP at 6.

Christensen responded that (1) CPS had determined that the bruising on his son was the result of "normal toddler bruising" and that no charges had resulted from this CPS report; (2) his son often had bruises from playing; (3) McDonough had been attempting to "take [his] son away from [him] for several years"; (4) McDonough had filed the petition for modification to retaliate for his having reported McDonough's boyfriend to "his command for committing adultery"; and (5) after McDonough filed her modification petition, she had returned their son to him (Christensen) with rashes, a persistent cough, inflamed testicles, and a malodorous groin area. CP at 27. Christensen also asserted that McDonough's domestic violence disclosures to Dr. Yi were "fabricated" and "unfounded." CP at 30. On January 25, 2011, the trial court found adequate cause for a hearing on the modification petition, but it lifted the temporary restraining order and reinstated the original parenting agreement.

### E. Second Petition for Protection Order; Motion for Contempt

On March 18, McDonough petitioned for a second protection order. She alleged that a friend caring for her son had reported that he was acting out sexually after a visit with Christensen and that the friend had contacted CPS and reported possible sex abuse. Christensen denied having sexually abused his son. It is not clear from the record whether the superior court granted McDonough's request for a second protection order.

Christensen also filed two contempt motions against McDonough, alleging various parenting agreement violations. A superior court commissioner did not find McDonough in contempt, but warned her that she needed to comply with the parenting agreement or he would find her in contempt in the future.

## II. PARENTING PLAN MODIFICATION TRIAL

In October 2011, the trial court considered McDonough's petition to modify the parenting plan. McDonough, the guardian ad litem (GAL),[3] and Christensen were the only witnesses.

### A. McDonough

McDonough testified about the domestic abuse that had occurred during her marriage to Christensen. In addition to the two incidents described in the above NCIS reports, she testified that (1) while in Guam, she and Christensen had physical altercations at least once a week; (2) she had also sought medical treatment after a fight with Christensen in October 2006 and in February 2008, after Christensen struck her in the side of the head with his fist, perforating her eardrum; and (3) in January 2010, Christensen had thrown her to the floor and started "choking [her] right in front of [their] son." 1 VRP at 28.

McDonough admitted that (1) at times she, too, had been physically violent or aggressive towards Christensen; (2) once she had struck him in the nose, making it bleed; (3) in September 2011, she had been arrested and charged with assault after an altercation with another person (not involved in this custody matter) who had been the aggressor, but that case had not yet gone to trial.

McDonough also testified about the circumstances surrounding her divorce and the original parenting agreement. She had agreed to the Guam divorce because she had met her current husband, and she wanted a divorce from Christensen as soon as possible. But in order to

---

[3] McDonough presented the GAL during her case-in-chief.

7

get Christensen to agree to the divorce, she had to agree to shared custody of their son and to allow Christensen to "disciplin[e]" *her* by striking her with various objects. 1 VRP at 35. Although she and Christensen had tried to comply with the Guam parenting agreement until December 2010, its lack of specificity had created conflict. When they entered into the parenting agreement, McDonough had not been aware that she could litigate it or the divorce.

On December 6, McDonough noticed bruising all over their son's legs, back, and head after a visit with Christensen, who had not told her "anything that had happened." 1 VRP at 37. The next day, she mentioned the bruising to their son's daycare workers, who told her that she needed to contact CPS or they would. McDonough reported the bruising to CPS and petitioned for a protection order.[4]

McDonough sought a second protection order in March 2011, when a friend of hers had reported to CPS concerns about possible sexual abuse because her son was acting out sexually after returning from a visit with his father. Although McDonough did not believe Christensen had sexually abused their son, she was concerned that someone else had been abusing him during his time with Christensen. She denied having filed for the protection orders to retaliate against Christensen for having reported her current husband to his command for adultery.

---

[4] McDonough also referred to the GAL's discussion about the CPS investigations. The trial court advised the parties that it would read the GAL report and that McDonough did not have to testify about the CPS report. The GAL report, however, is not part of the record before us on appeal.

McDonough further testified that she and Christensen had undergone domestic violence evaluations that the GAL had recommended.[5] The evaluator had recommended counseling and treatment for both parties, which McDonough was willing to follow. Nevertheless, McDonough was "scared of [Christensen's] anger issues," and concerned that he might injure their son if the child "start[ed] acting up." 1 VRP at 59. She believed that Christensen had caused the bruising she had previously reported to CPS because, although the child had obvious bruising when he returned from his father's care, Christensen did not tell her that anything had happened to the child.

### B. GAL

The GAL testified about the contents of her report.[6] The CPS records stated that a CPS social worker had personally observed the child's injuries on December 8, 2010, and that, at the time, the social worker had found the injuries "['] consistent with toddler activity and not concerning.[']" 2 VRP at 107. Doherty's December 9, 2010 letter stating that the child's injuries were *not* consistent with normal bruising caused by play activities directly contradicted the social worker's December 8 finding. The GAL acknowledged, however, that ultimately CPS had found the two CPS reports to be unfounded.

The GAL also testified about the couple's domestic violence evaluations. The evaluator had found that Christensen

---

[5] Although the trial court admitted these evaluations, they are not part of the record before us on appeal.

[6] The trial court also admitted photographs of the child's injuries. These photographs, however, are not part of the record before us on appeal.

had a clearly defined pattern of violent or abusive behavior with his family or household members, and [that] there was mutual combat between Mr. Christensen and Ms. [McDonough] on occasions and there was a flaring of tempers, controlling behavior, physical and sexual violence during the course of their relationship.

2 VRP at 111. Noting that McDonough had been "a victim of domestic violence by [Christensen] for the period of their relationship," the evaluator had (1) recommended that McDonough attend various programs and engage in individualized therapy, and (2) concluded that Christensen had the following psychological issues: "narcissistic personality disorder with histrionic personality traits, obsessive compulsive personality traits, and paranoid personality features," which the evaluator opined were "moderate." 2 VRP at 112-13, 114.

The GAL was first inclined to recommend that Christensen have primary custody of the child because McDonough appeared to have been engaging in "abusive use of conflict." 2 VRP at 126. But the GAL had changed her mind after reviewing the couple's domestic violence evaluations and learning about their domestic violence history, which explained why McDonough's behavior may have appeared to be irrational or not credible. According to the GAL, in light of this domestic violence history, it was likely that McDonough's behaviors were attempts to protect herself or her child. Consequently, the GAL recommended that McDonough should be the primary parent until after Christensen received treatment and was reevaluated.

Although acknowledging that there was a strong bond between Christensen and his son, the GAL found this bond "concerning" because the CPS reports indicated that the child had

witnessed Christensen abuse McDonough[7] and there was a risk that the child would "imitate [Christensen's] behavior." 2 VRP at 117. Because of this concern, the domestic violence history, and Christensen's mental health issues, the GAL recommended that Christensen's visitation be limited to two consecutive weekends, followed by an intervening weekend in McDonough's care, with occasional extra days for holidays or special events if those extra days were not consecutive to the weekend visitations.

### C. Christensen

Christensen testified that his and McDonough's marriage was "volatile," that they fought, and that these fights would sometimes become physical. 1 VRP at 67. He explained the incidents that the NCIS investigated had occurred when McDonough had physically attacked him and he had to use some force against McDonough to protect himself or to calm her down. Although he had attended a "three-month program" during one of the investigations at his command's recommendation, he emphasized that the NCIS investigations resulted in no "charges" being filed and "[n]o actions [being] taken." 1 VRP at 69, 72.

Christensen denied having perforated McDonough's eardrum, asserted that the spankings had all been consensual, and alleged that during their marriage, McDonough had attempted to stab him, threatened to kill herself with a knife, jumped on him from behind, and attacked him in his sleep. Christensen also denied having required McDonough to engage in a "disciplining session" or any other conditions before signing the Guam parenting agreement. 1 VRP at 81.

---

[7] The GAL testified that the NCIS reports showed that the parents had engaged in physical conflict in the child's presence.

11

But he did acknowledge having required McDonough to agree that the grounds for divorce would be her adultery.

Christensen also denied sexually or physically abusing his son. He testified that he had not been present when his son was bruised and that his family had told him that the child had fallen while playing and hit his thigh and his head. Christensen also testified that after having been with McDonough, their son had come to him with new bruising—a black eye, a bruised forehead, and a "gash down his back." 2 VRP at 149. When he had asked McDonough about these injuries, she told him that the child had slipped off of a picnic bench; but he (Christensen) did not think this made sense.

Christensen further testified that he had expressed concern about their domestic violence evaluator and that he disagreed with the evaluations, which Christensen asserted mischaracterized some of his statements, ignored information he had provided, and downplayed negative information about McDonough. Christensen also objected to some test score evaluations. On cross-examination, however, Christensen admitted that he had no training or experience interpreting domestic violence reports. Christensen claimed that he had not had time to retain an expert to review or to contest the domestic violence evaluations and had considered asking for a continuance.

## D. Decision

The trial court issued a letter ruling and an order modifying the Guam parenting

agreement under RCW 26.09.260(1), (2)(c).[8] This order expressly adopted the facts the court set out in its letter ruling. The trial court specifically found that McDonough's testimony about the domestic violence was credible. The trial court also found a substantial change of circumstances based on facts that had arisen since the Guam parenting agreement (such as the child's injuries that McDonough reported to CPS) and circumstances that the Guam court had not known at the time it had entered the divorce decree and parenting plan (such as the couple's domestic violence background). The trial court placed particular emphasis on Doherty's letter stating that the child's bruising was "not consistent with the activities of a similar aged toddler," and McDonough's testimony about the "circumstances under which the agreed Guam dissolution occurred." CP at 178.

---

[8] RCW 26.09.260 provides in part:

> (1) Except as otherwise provided in subsections (4), (5), (6), (8), and (10) of this section, the court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan *or that were unknown to the court at the time of the prior decree or plan*, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child. The effect of a parent's military duties potentially impacting parenting functions shall not, by itself, be a substantial change of circumstances justifying a permanent modification of a prior decree or plan.
>
> (2) In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:
>
> . . .
>
> (c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

(Emphasis added).

Although the trial court acknowledged that both McDonough and Christensen had mental health issues, it concluded that McDonough should be the primary parent with sole major decision making responsibility and that Christensen's time with the child should be limited under former RCW 26.09.191 (2007) based on the domestic violence history.[9] The trial court followed the GAL's recommendations for the child's visitation with Christensen. The court also required both parents to enroll in various treatment programs and other therapy or counseling.

After the trial court issued its letter ruling but before it issued its order, Christensen moved for reconsideration arguing, inter alia, that the evidence did not support the trial court's decision and that he had "[n]ewly discovered evidence" that undermined McDonough's credibility and showed that the domestic violence evaluations were incorrect. CP at 183. Instead of directing the court to any specific "newly discovered evidence," Christensen merely noted that he was seeking "further evaluations to shed light on the disparaging and biased report [that the domestic violence evaluator had] provided." CP at 183. He stated that he was seeking additional information from Guam and attached copies of emails that showed McDonough had been in contact with a Guam attorney regarding the divorce before he (Christensen) returned from Afghanistan. Christensen further asserted that he had wanted to obtain a trial continuance to seek evidence that would challenge these evaluations but that his counsel had "discouraged this and [they] continued on with the trial per [counsel's] recommendation." CP at 183. The trial court denied Christensen's motion for reconsideration.

---

[9] The trial court noted, however, that Christensen could later move to modify the parenting plan if he successfully pursued treatment and there was no further evidence of domestic violence.

One month later, after the trial court filed its order and Christensen had filed his notice of appeal, Christensen filed an evaluation conducted by Sierra L. Swing, Psy. D. Swing had reviewed the original domestic violence evaluations and the records on which they were based; and Swing had retested Christensen. The record does not show that Christensen ever attempted to bring Swing's report to the trial court's attention; nor does it appear that the trial court ever considered it.[10] Christensen appeals.

## ANALYSIS

### I. ADDITIONAL EVIDENCE

As a preliminary matter, Christensen's reply brief asks us to consider Swing's domestic violence evaluation, even though this report was not before the trial court during trial or when it considered Christensen's motion for reconsideration. Contending that we can consider Swing's evaluation under RAP 9.11(a), Christensen cites Swing's evaluation to show that the trial court improperly relied on the original domestic violence evaluations that the GAL had recommended. Christensen is incorrect.

We consider only the evidence that was before the trial court at the time it made its decisions.[11] *See* RAP 9.1; RAP 9.11. Again, Swing's evaluation was not before the trial court;

---

[10] Swing's report is part of the record before us on appeal.

[11] Even if we were to consider Christensen's motion in his reply brief, we would refuse to consider this additional evidence. Before we could consider additional evidence under RAP 9.11(a), Christensen would have to show, among other factors, that "it is equitable to excuse a party's failure to present the evidence to the trial court." RAP 9.11(a)(3). Christensen fails to make this showing. He had the opportunity to present this evidence at trial or in his motion for reconsideration, but he failed to do this. He also could have requested continuances if he needed additional time to obtain this evidence, but he failed to do so; moreover, his motion for

and Christensen did not file a motion under RAP 9.11 asking us to consider it as additional evidence on review. Furthermore, we will consider a motion contained in an appellate brief only if the motion, if granted, would preclude hearing the case on the merits, which is not the case here. RAP 10.4(d). Accordingly, we deny Christensen's request to consider the Swing evaluation.

## II. SUBSTANTIAL CHANGE OF CIRCUMSTANCES

Christensen next argues that the trial court erred in concluding that a substantial change of circumstances justified modifying the parenting plan.[12] He asserts that (1) he has never committed any acts of domestic violence; (2) in finding that he had committed domestic

---

reconsideration states that he spoke to counsel about obtaining a continuance but ultimately decided against it.

Furthermore, Christensen incorrectly asserts that Swing's evaluation "was properly preserved for appeal at the Motion for Reconsideration." Appellant's Reply Br. at 2. On the contrary, in his motion for reconsideration, Christensen *merely alluded to the possibility* of evidence contradicting the domestic violence evaluation; he neither specifically noted Swing's evaluation nor included it with his motion for reconsideration. Thus, the trial court never had the opportunity to consider Swing's evaluation.

[12] Christensen also assigns error to the trial court's failure to consider *not* imposing domestic violence limitations under RCW 26.09.191(2)(n); he asserts that this failure shows trial court bias against him. Although Christensen mentions this issue in his assignments of error, he fails to present any argument supporting it; thus, we need not further address this assignment of error. RAP 10.3(a)(6).

We note, however, that there is ample evidence in the record suggesting that it was unlikely that the trial court would have entered RCW 26.09.191(2)(n) findings. For example the GAL testified she was concerned about the child's having extended visits with Christensen because, according to various reports, the child had witnessed Christensen abuse McDonough and there was a risk that the child "will imitate [Christensen's] behavior" if the child was in Christensen's care for extended periods of time. 2 VRP at 117. Thus, even if Christensen had developed this argument, we could not say that the trial court erred in not considering RCW 26.09.191(2)(n) or that its failure to do so in any way evidenced bias against Christensen.

violence, the trial court "ignored three years of facts and evidence"; (3) the trial court erred in finding McDonough's testimony credible; (4) the evidence showed that any domestic violence allegations were unfounded; and (5) CPS found the physical and sexual abuse allegations involving his son to be unfound.[13] Br. of Appellant at 6. Christensen also argues that the trial court failed to "provide . . . justification for" its findings. Br. of Appellant at 9. We disagree.

### A. Standards of Review

> We [will] uphold the trial court's findings of fact if supported by substantial evidence. [*In re Marriage of*] *McDole*, 122 Wn.2d 604, [610,] 859 P.2d 1239 [(1993)], *Chapman v. Perera*, 41 Wn. App. 444, [449,] 704 P.2d 1224[, *review denied*, 104 Wn.2d 1020 (1985)]. We do not reverse a trial court's decision to modify a parenting plan under RCW 26.09.260 unless the trial court exercised its discretion in an untenable or manifestly unreasonable way. *McDole*, 122 Wn.2d 604, 859 P.2d 1239.

*Velickoff v. Velickoff*, 95 Wn. App. 346, 352-353, 968 P.2d 20 (1998). We do not review credibility determinations or weigh evidence on appeal. *In re Marriage of Meredith*, 148 Wn. App. 887, 891 n.1, 201 P.3d 1056, *review denied*, 167 Wn.2d 1002 (2009).

### B. Substantial Evidence

A trial court can modify an existing parenting plan only if it

> finds upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.

---

[13] Christensen also argues that the trial court erred in basing its decision on "an improperly conducted" evaluation. Br. of Appellant at 7. This argument relies entirely on Swing's report's criticisms of the original domestic violence evaluations, which we decline to consider. Accordingly, we do not further address this argument.

RCW 26.09.260(1). In finding a change of circumstances, the trial court here relied on both the child's injuries and on new information about McDonough's and Christensen's marital relationship and the circumstances under which they entered into the original parenting agreement. The record supports these findings.

The trial court found that Doherty's letter disclosed that both Doherty and Dr. Yi were concerned about the child's welfare when in Christensen's care; it concluded that the child's injuries "were in unusual places and were not consistent with the activities of a similar aged toddler." CP at 237. Despite that CPS ultimately determined the abuse allegations were unfounded, the trial court apparently found Doherty and Dr. Yi's conclusions about the nature of the child's injuries credible and/or accurate, especially after viewing photographs and hearing testimony from the parties. And we will not second-guess the trial court's conclusion that Doherty's letter was more accurate than the CPS determinations on this point. *Meredith*, 148 Wn. App. at 891 n.1 The questionable bruising on the child after his visitation with Christensen provided sufficient evidence to establish a change of circumstances that arose after entry of the Guam parenting plan, especially where, as we previously noted, the Guam court had entered this agreed plan with no knowledge of the couple's domestic violence history.

Furthermore, although numerous law enforcement/NCIS reports from Guam did not show that Christensen was ultimately charged with any acts of domestic violence against McDonough, the trial court found credible McDonough's testimony about Christensen's assaultive behavior during their marriage. Again, we will not review the trial court's credibility

determination.[14] *Meredith*, 148 Wn. App. at 891 n.1

McDonough also testified about abusive behavior that none of the Guam law enforcement/NCIS reports had addressed. Again, because the Guam parenting plan was based on the parties' agreements and nothing in the record shows that the Guam court was aware of any previous domestic violence allegations, the record shows that no court had previously considered these circumstances. McDonough's testimony about the reported assaults, assaults not previously mentioned in any reports, and the circumstances under which she agreed to the Guam parenting plan is sufficient to support the trial court's finding that there that were significant facts unknown to the Guam court at the time it entered the parenting plan. *See* RCW 26.09.260(1) ("[T]he court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan *or that were unknown to the court at the time of the prior decree or plan*, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child." (Emphasis added)). We hold, therefore, that changed circumstances support the trial court's parenting plan

---

[14] Christensen also appears to argue that the trial court erred in relying on (1) the domestic violence evaluations, which concluded that Christensen had engaged in domestic violence during his marriage to McDonough; and (2) the GAL report to the extent it relied on these evaluations. Because Christensen's arguments focus on the criticisms in Swing's evaluation, which is not before us, we do not further address these arguments.

modification.[15]

### III. MOTION FOR RECONSIDERATION

Christensen also appears to argue that the trial court erred in denying his motion for reconsideration. He contends that the emails he attached to his motion for reconsideration demonstrate that McDonough lied about the circumstances surrounding the Guam divorce and parenting plan because they controvert her testimony that they did not begin to pursue the Guam divorce until after he returned from Afghanistan. This argument also fails.

We review a trial court's denial of a motion for reconsideration for abuse of discretion. *Meridian Minerals Co. v. King County*, 61 Wn. App. 195, 203, 810 P.2d 31, *review denied*, 117 Wn.2d 1017 (1991). A trial court abuses its discretion when its decision rests on untenable grounds or untenable reasons. *Mayer v. Sto Industries, Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006). Christensen fails to show such abuse here.

Although the emails may have shown that McDonough inaccurately represented exactly when the couple decided to pursue the divorce in Guam, the timing of this decision does not relate to the relevant circumstances surrounding that parenting agreement at issue here. The emails do not contradict McDonough's testimony that Christensen had engaged in domestic violence towards her during their marriage, that she believed agreeing to the terms Christensen

---

[15] Christensen also suggests that the trial court did not "provide a rationale for the finding of adequate cause" to modify the parenting plan and that the "absence of these findings" demonstrates that the court did not consider the relevant factors. Br. of Appellant at 14. Again, Christensen is incorrect: The trial court made specific findings supported by its rationale in its letter ruling, which it expressly incorporated into the modification order. Accordingly, this argument also fails.

No. 42885-7-II

required was the only way she could obtain a divorce, or that she agreed to his terms only because she was desperate to get out of an abusive relationship. We hold that the trial court did not abuse its discretion in denying Christensen's motion for reconsideration.

IV. ATTORNEY FEES

McDonough requests attorney fees under RCW 26.09.140. Under RAP 18.1(c), an affidavit of financial need is required. McDonough has not filed the required affidavit. Accordingly, we deny her request for attorney fees.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, P.J.

We concur:

Penoyar, J.

Bjorgen, J.

21