[No. 31856. Department Two. March 27, 1952.]

THE STATE OF WASHINGTON, *on the Relation of June B. Miller,*
*Appellant,* v. JOHN B. CAIN, *as Superintendent of*
*Buildings of the City of Seattle, Respondent.*[1]

[1]Reported in 242 P. (2d) 505.

*Wettrick, Flood & O'Brien,* for appellant.

*A. C. Van Soelen* and *J. Ambler Newton,* for respondent.

*Harold S. Shefelman, amicus curiae.*

HILL, J.—Appellant owns an improved lot, 50′ by 100′, at the southwest corner of Broadway and Roanoke streets in the city of Seattle. In 1923, at the time of the adoption of the zoning ordinance in that city, there was a gasoline service station on the lot, a wooden structure fifteen feet square with an attached canopy, also fifteen feet square, which covered two gasoline pumps. When the boundaries of the various use districts were established, appellant's lot was within a first residence district, and the gasoline service station became a permitted nonconforming building and use under the terms of the ordinance.

Appellant now seeks a building permit to "Reconstruct Existing Service Station"; in her pleadings and in her briefs, she refers to essential "repairs, remodeling and modernizing." But what she plans is to erect a new building 43′ 6″ by 14′ 6″ which will contain, as added facilities, a grease rack and toilets. The construction for which she seeks a building permit is not in any sense the repair, remodeling, modernizing, or alteration of the existing structure. The present wooden building, covering 225 square feet, with a canopy covering another 225 square feet, would be razed and replaced by a steel reinforced structure covering 631 square feet. It was testified that "about all" that could be salvaged from the old building for use in the new is the glass.

The permit was refused on the ground that its issuance would be in violation of the zoning ordinance. Appellant sought a writ of mandate to compel the superintendent of buildings to issue the permit. The superior court refused to issue the writ, and this appeal followed.

■ Zoning ordinances are constitutional in principle as a valid exercise of the police power. *Village of Euclid v. Ambler Realty Co.*, 272 U. S. 365, 71 L. Ed. 303, 47 S. Ct. 114 (1926), 54 A. L. R. 1016.

■ The Seattle zoning ordinance permits, as do zoning ordinances generally, the continuance of certain but not all nonconforming uses existing at the time of the adoption of the ordinance. The reason for permitting their continuance is well stated in *Austin v. Older*, 283 Mich. 667, 278 N. W. 727 (1938):

"An ordinance requiring an immediate cessation of a nonconforming use may be held to be unconstitutional because it brings about a deprivation of property rights out of proportion to the public benefit obtained."

The pertinent portion of the section of the Seattle ordinance permitting nonconforming uses is § 9 (b), which reads as follows:

"Subject to the provisions of Paragraph (a) and (f) of this section, the lawful use of a building or premises existing at the time of the adoption of this ordinance but not conforming to the provisions for the use district within which it is located may continue; *provided that no structural alterations are made except such as the Superintendent of Buildings shall deem necessary for the safety of the building. The combined cost of all alterations and repairs in any ten year period shall not exceed the assessed valuation of the building at the time the last allowable permit is applied for.*" (Italics ours.)

(Paragraph (a) provided for discontinuance of certain trades and industries in any except industrial areas after December 31, 1923 (a grace period of six months), and (f) provided that in first and second residence districts "any nonconforming use of premises which is not in a build-

ing shall be discontinued within a period of one year" from the date the ordinance became effective.).

■ From the italicized words, it is evident that the spirit of the Seattle zoning ordinance, like that of zoning ordinances generally, is against the extension of nonconforming uses. By implication, the ordinance restricts changes in nonconforming buildings to repairs, and alterations necessary to structural safety. Such limitations on nonconforming uses and, indeed, much more stringent ones, are generally upheld. *Thayer v. Board of Appeals of Hartford,* 114 Conn. 15, 157 Atl. 273 (1931); *Rehfeld v. San Francisco,* 218 Cal. 83, 21 P. (2d) 419 (1933); *DeVito v. Pearsall,* 115 N. J. L. 323, 180 Atl. 202 (1935); *Austin v. Older, supra*; *Colati v. Jirout,* 186 Md. 652, 47 A. (2d) 613 (1946); *Standard Oil Co. v. Tallahassee,* 183 F. (2d) 410 (1950).

■ The holdings are practically unanimous that a nonconforming building devoted to a nonconforming use cannot be replaced with a new and larger nonconforming building even though it would be devoted to the same use. *DeVito v. Pearsall, supra*; *Austin v. Older, supra*; *Selligman v. Von Allmen Bros.,* 297 Ky. 121, 179 S. W. (2d) 207 (1944); *Goodrich v. Selligman,* 298 Ky. 863, 183 S. W. (2d) 625 (1944); *Colati v. Jirout, supra.*

Appellant relies on two Washington cases, *Liberty Lbr. Co. v. Tacoma,* 142 Wash. 377, 253 Pac. 122 (1927), and *State ex rel. Modern Lbr. & Millwork Co. v. MacDuff,* 161 Wash. 600, 297 Pac. 733 (1931). The matters actually decided in those cases seem to us to have little applicability to the present controversy. In the *Liberty Lumber Company* case we were concerned with what constitutes the "establishment" of a business within the meaning of a zoning ordinance requiring the consent of seventy-five per cent of the owners of the property within a radius of three hundred feet of the site, to the establishment of an industrial business in a residential district. In the *Modern Lumber Company* case, at the time the lumber company applied for a building permit to replace its retail lumber yard building, which had been destroyed by fire, it had a right to a permit.

When the building inspector refused to issue one, the lumber company brought an action for a writ of mandate to compel its issuance, which writ was returnable February 6, 1930. On February 3, 1930, the city council amended its zoning ordinance to prohibit lumber yards within retail districts. We quite properly held that the amendment prohibiting retail lumber yards in retail districts was palpably aimed at the lumber company and that it bore no substantial relation to the public health, safety, morals or general welfare.

Appellant vigorously and eloquently argues that she has a vested right to utilize her property as a gasoline service station. Although the city points out that it has taken no steps to interfere with the use of her property for that purpose, she contends that, in effect, it does prevent its use for that purpose by denying the building permit now requested, as competitive conditions, changed techniques in lubrication, etc., make it imperative that a new and more commodious structure be erected.

We are not in accord with appellant's contention that she is possessed for all time of the right to utilize her property as a gasoline service station, unless and until it can be classed as a nuisance. We cannot agree, as she seems to argue, that, since a service station was being operated on her lot when the zoning ordinance was adopted, it became an island surrounded by property subject to the exercise of the police power as exemplified in the zoning ordinance, but itself untouched thereby. The theory of the zoning ordinance is that her nonconforming use is in fact detrimental to some one or more of those public interests (health, safety, morals or welfare) which justify the invoking of the police power; but the nonconforming use was permitted to continue because its termination would constitute a hardship on her greater than the benefit the public would derive from termination of the use.

It was not and is not contemplated that pre-existing nonconforming uses are to be perpetual. The following state-

ments as to the ultimate purpose of zoning ordinances are frequently quoted:

"The ultimate purpose of zoning ordinances is to confine certain classes of buildings and uses to certain localities. The continued existence of those which are nonconforming is inconsistent with that object, and it is contemplated that conditions should be reduced to conformity as completely and as speedily as possible with due regard to the special interests of those concerned, and where suppression is not feasible without working substantial injustice, that there shall be accomplished 'the greatest possible amelioration of the offending use which justice to that use permits.' 'The accepted method of accomplishing this result is as follows: The nonconformity is in no case allowed to increase. It is permitted to continue until some change in the premises is contemplated by the owner, when, in so far as expedient, the authorities take advantage of this fact to compel a lessening or complete suppression of the nonconformity.' Williams, Law of City Planning and Zoning, pp. 202, 203; *Lathrop v. Norwich, supra* [111 Conn. 616, 623, 151 Atl. 183]." *Thayer v. Board of Appeals of Hartford, supra* (p. 23).

"In enacting such ordinances, however, municipal authorities have had in mind the injustice and doubtful constitutionality of compelling the *immediate removal* of the objectionable buildings already in the district, and have usually made express provision that these *nonconforming uses* may be continued, without the right to enlarge or rebuild after destruction. The object of such provision is the gradual elimination of the nonconforming use." *Rehfeld v. San Francisco, supra.*

"The theory of zoning is to foster improvement by confining certain classes of buildings and uses to certain localities without imposing undue hardship upon the property owners. The present use of a non-conforming building may be continued but it cannot be increased nor can it be extended indefinitely if zoning is to accomplish anything. It is customary for zoning ordinances to provide that the life of non-conforming buildings cannot be increased by structural alterations and when a change is made by the owner in the building, he must make it conform to the ordinance." *Selligman v. Von Allmen Bros., supra.*

Appellant concedes that the Seattle zoning ordinance, considered, as she says, *"in vacuo,"* may not be unconstitu-

tional, but urges that it cannot, in its application to her property, be justified as an exercise of the police power. The courts, however, having swallowed the camel of zoning ordinances as representing a constitutional exercise of the police power, have not strained greatly at the gnats of restrictions on owners' rights to alter, reconstruct or replace nonconforming buildings as being also within the police power. See annotation, "Zoning: changes, after adoption of zoning regulations, in respect of nonconforming existing use," 147 A. L. R. 167 (1943). In *Austin v. Older, supra,* it was said:

"An ordinance requiring an immediate cessation of a nonconforming use may be held to be unconstitutional because it brings about a deprivation of property rights out of proportion to the public benefit obtained, but an ordinance prohibiting the enlargement of a nonconforming building is not subject to the same infirmity. This more limited restriction on the owner's rights in the use of his property is within the police power and such ordinances have been held valid."

We conclude that appellant has no such vested right in the perpetuation of the use of her property as a gasoline service station as would compel the issuance of a building permit for a new and larger nonconforming building to make that use effective.

Section 2 (c) of the zoning ordinance provides that no building shall be erected, altered or used for any purpose other than that permitted in the use district in which the building is located, except as provided in §§ 9 and 28 of the ordinance. We have considered the applicable portion of § 9, to wit, § 9 (b), and we here hold that the portion thereof which in effect restricts the construction of new and larger nonconforming buildings in the place of existing nonconforming buildings is constitutional. Section 28 is inapplicable.

But appellant has still another line of attack, *i.e.,* that a nonconforming use of her property having been recognized and permitted, she cannot be deprived of that use except by condemnation unless it can be shown that the public health,

safety, morals or welfare (the basis for the exercise of the police power) requires the cessation of that use.

▮ Appellant here proceeds upon the erroneous theory that whether or not zoning restrictions should apply to her particular property is a matter which can be determined, to use her own phrase, *"in vacuo."* If courts were to consider each individual lot separate and apart from every other lot in a particular use district, and try to determine whether any given structure erected or to be erected on it is dangerous or inimical to the public health, safety, morals or welfare, there could be no successful zoning. The public welfare must be considered from the standpoint of the objective of the zoning ordinance and of all the property within any particular use district. The supreme court of California dealt with a similar contention, where the superior court had made a finding that the structure to be erected on a particular lot would not endanger the public welfare, and said:

"We have in this case an admittedly valid zoning ordinance, and a nonconforming use which has been permitted to remain under the provisions of the ordinance. Upon what logic may that permission be transferred into a right to obtain more than the ordinance gives? No one in the district may build a new store, and it would be unwarranted discrimination in favor of plaintiffs to permit them to enlarge their existing store in this residential district. The finding that the public welfare would not be endangered is beside the point. Obviously a *rezoning* would not cause injury to the public, but the whole value of zoning lines is the establishment of more or less permanent districts, well planned and arranged. If, upon the complaint of the owner, the courts are to re-examine each instance of inclusion or exclusion of property from a district, solely with regard to the dangerous or nondangerous character of the particular structure, and irrespective of the general scheme of the ordinance, then there is, of course, no possibility of ever achieving successful zoning." *Rehfeld v. San Francisco, supra.*

Appellant has made much of a situation to which we have not heretofore adverted, namely, that on a corner tract directly across the street from her property, the city of

Seattle, in 1937, permitted the erection of a building comparable to the one appellant desires to erect. That tract was and is in the same use district as appellant's property. Like her lot, it was improved with a small wooden structure and was being used as a gasoline service station at the time of the adoption of the zoning ordinance, and the nonconforming use was permitted to continue under § 9 (b) of the ordinance. In 1937, the tract was rezoned as business property. Service stations are permitted in business use districts, and the superintendent of buildings therefore granted a permit for the erection of a new service station. After its completion the tract was rezoned and again placed in the first residence use district. Appellant endeavored to follow the same procedure in 1950, but the city council refused to rezone her lot as business property.

To meet appellant's claim of discrimination, the respondent has pointed out certain distinguishing features between the two properties, notably that the tract on which the service station was erected in 1937 is 100′ by 110′, or more than twice the size of appellant's lot, and, in addition to having streets on two sides, it has an alley on a third side, and the building itself is considerably farther removed from the nearest residence than the building sought to be erected on appellant's lot would be. It is also worthy of note that the city council might, in a period of thirteen years, have changed its views as to what is for the public welfare in any particular district, or may have decided not to duplicate previous error. *Larkin Co. v. Schwab*, 242 N. Y. 330, 151 N. E. 637 (1926).

The superintendent of buildings did not discriminate against the appellant; he followed the zoning ordinance in both instances. He granted a building permit for a new service station in a business use district in 1937; he refused a building permit for a new service station in a first residence district in 1951. If there was any discrimination, it was in the city council's temporary rezoning of the property across the street in 1937 and refusal to take similar action with respect to appellant's property in 1950 or 1951. What

induced the city council's action in 1937 is not before us, nor is appellant directly attacking the council's failure to rezone her property.

It should be here noted that "spot" zoning such as that done by the city in 1937 is almost universally condemned, and, since it is generally difficult to justify under the police-power concept, many spot zoning ordinances have been vulnerable to attack, although the courts have been careful not to lay down any hard and fast rule that all spot zoning is illegal. *Linden M. E. Church v. City of Linden,* 113 N. J. L. 188, 173 Atl. 593 (1934); *Mueller v. C. Hoffmeister Undertaking & Livery Co.,* 343 Mo. 430, 121 S. W. (2d) 775 (1938); *DeBlasiis v. Bartell,* 143 Pa. Super. 485, 18 A. (2d) 478 (1941); *Leahy v. New Bedford Inspector of Buildings,* 308 Mass. 128, 31 N. E. (2d) 436 (1941); *Page v. Portland,* 178 Ore. 632, 165 P. (2d) 280 (1948); *Polk v. Axton,* 306 Ky. 498, 208 S. W. (2d) 497 (1948); *Edgewood Civic Club v. Blaisdell,* 95 N. H. 244, 61 A. (2d) 517 (1948); *Cassell v. Mayor & City Council of Baltimore,* 73 A. (2d) (Md.) 486 (1950). See, also, annotations, 128 A. L. R. 740, 149 A. L. R. 292.

But when a spot rezoning is a *fait accompli,* it does not justify additional spot rezoning for the benefit of other property owners who may conceive themselves to be similarly situated. It has quite uniformly been held that permitting some persons to violate a zoning regulation does not preclude its enforcement against others. *Larkin Co. v. Schwab, supra; People ex rel. Fordham Manor Reformed Church v. Walsh,* 244 N. Y. 280, 155 N. E. 575 (1927); *Hasley's Appeal,* 151 Pa. Super. 192, 30 A. (2d) 187 (1943); *Ventresca v. Exley,* 358 Pa. 98, 56 A. (2d) 210 (1948); *Safeway Stores v. San Mateo City Council,* 86 Cal. App. (2d) 277, 194 P. (2d) 720 (1948). See, also, annotation, 119 A. L. R. 1509, 1517.

In *People ex rel. Fordham Manor Reformed Church v. Walsh, supra,* Chief Justice (of the court of appeals of New York) Cardozo said:

"The situation must be rare indeed where the concession of such a privilege can be demanded as of right. A typical case is *People ex rel. Werner v. Walsh* (240 N. Y. 689). The owner whose petition had been denied, complained that he was the victim of arbitrary discrimination in that other applications had been granted at the instance of neighboring owners not differently situated. We found a basis in the record for the exercise of judgment. Not improbably the Board had made a mistake in granting like favors to other owners in the past. This did not mean that it was subject to a legal duty to enlarge the field of encroachment and thereby magnify the error. The question was not 'whether some one else' had 'been favored.' The question was 'whether the petitioner' had 'been illegally oppressed.' "

We find nothing in our decisions inconsistent with the holding of the trial court, which we find is in accord with the great weight of modern authority, and the judgment dismissing appellant's application for a writ of mandate is affirmed.

HAMLEY, FINLEY, and OLSON, JJ., concur.

SCHWELLENBACH, C. J., concurs in the result.