946 P.2d 768 (1997)
133 Wash.2d 647
Craig CHRISTIANSON and Theresa Christianson, husband and wife, Petitioners,
v.
SNOHOMISH HEALTH DISTRICT, Respondent.
No. 64255-9.
Supreme Court of Washington, En Banc.
Argued February 12, 1997.
Decided November 13, 1997.
*769 Nielsen, Nielsen, Inc., P.S., Drew T. Nielsen, Everett, for petitioners.
Crowley Law Offices, William J. Crowley, Seattle, for respondent.
MADSEN, Justice.
The Christiansons seek review of a Court of Appeals decision affirming the Health District's denial of a construction clearance for an addition to their lakeside cabin. They argue that the District's decision is not supported by substantial evidence and that their right to substantive due process has been violated. We affirm the Court of Appeals.

*770 STATEMENT OF THE CASE
In August of 1990, the Christiansons purchased a cabin on the south shore of Lake Bosworth. They use the cabin for weekend recreation. The cabin is on a small lot, steeply sloped downward toward the lake from the road on the south. There is no public sewer system available to serve the property.
The cabin is a small (24'8" by 181"), single story structure with a 10' by 22'4" deck that that runs across the north and east side of the cabin. Prior to 1991, the interior was divided into a full living room, a small sleeping area, a kitchen and a closet-sized room containing a toilet. The only plumbing structures in the cabin were a kitchen sink and a toilet. A well was located about sixteen feet south (uphill) of the cabin, a septic tank was located under the deck near the northwest corner of the cabin and a drainfield for the septic tank was located between the deck and the Lake Bosworth shoreline.
During the summer of 1991, the Christiansons began building an addition to their cabin, expanding it by ten feet across the full width of the south side of the cabin. The Christiansons failed to acquire permits for the addition from either Snohomish County or the Snohomish Health District (the District). The addition relocates and enlarges the bedroom area, creates a storage room that is comparable in size to the bedroom, relocates the bathroom, and enlarges the existing kitchen. The original structure was 432 square feet and the addition increases the size of the cabin by 180 square feet.
In August of 1991, the District responded to a complaint of foul odors and exposed sewage on the Christiansons' property and discovered that the old septic system on the Christiansons' lot was failing. The investigator also discovered that an addition was being built to the existing cabin without a permit. The investigator found that the old septic system was being drained through an open ditch running towards the lake into a gravel-filled pit situated approximately ten feet from the lake shoreline. The District notified the Christiansons that they would have to repair their failing septic system. On August 27, 1992, the Christiansons installed a new system which was approved by the District. Although the repaired system does not meet District standards provided in WAC 246-272 for a new onsite sewage disposal system, in many respects, the District believes that the repaired system is the best that can be obtained for the site. The District also determined that the repaired system will fail hydraulically before the cabin fails, even if the cabin is not enlarged.
At the same time the Christiansons were obtaining a repair permit for their failing septic system, they also sought a construction clearance permit for the addition to their cabin. The District denied the permit, citing Resolution 87-35, which prohibits the construction of additions to buildings with substandard septic systems. Resolution 87-35 provides that every building to which "additions, alterations, or improvements are made" must be served by an onsite sewage disposal system which meets District standards as provided in WAC 246-272. The Resolution does permit the District to waive its requirements in cases meeting certain prescribed criteria. The District, however, determined that the waiver criteria were not met in this case.
In a Step One Appeal, the Environmental Health Division sustained the District's decision to deny the Christiansons construction clearance permit. The Christiansons appealed the District's decision to the Environmental Health Hearing Examiner. In a fact finding hearing, the Hearing Examiner found that the denial of the construction clearance permit application was justified under Resolution 87-35.
The Board of Health denied the Christiansons' appeal from the Hearing Examiner's decision. The Christiansons sought a writ of review in Superior Court. The Superior Court found substantial evidence to affirm the decision of the Hearing Examiner and concluded that Resolution 87-35, as applied to the Christiansons, does not violate substantive due process. In a published opinion, the Court of Appeals affirmed. See Christianson v. Snohomish Health Dist., 82 Wash. App. 284, 917 P.2d 1093 (1996). Petitioners *771 sought review before this court and their petition for review was granted.

SUBSTANTIAL EVIDENCE
Petitioners assert that the Hearing Examiner's findings are not supported by substantial evidence. The Hearing Examiner's findings are reviewed for substantial evidence and alleged errors of law are reviewed de novo. See Hilltop Terrace Homeowner's Ass'n v. Island County, 126 Wash.2d 22, 29, 891 P.2d 29 (1995). "The test of substantial evidence is whether evidence is sufficient to persuade a fair-minded person of the truth of the declared premise." Sparks v. Douglas County, 127 Wash.2d 901, 910, 904 P.2d 738 (1995). The burden is on the challenging party to show that the decision is not supported by substantial evidence. See Nordstrom Credit, Inc. v. Department of Revenue, 120 Wash.2d 935, 939-40, 845 P.2d 1331 (1993).
There are separate and distinct review criteria for the repair of failing systems and for systems installed in conjunction with remodeling. Onsite sewage systems which are failing must be repaired "to the maximum extent permitted by the site." WAC 246-272-16501(1)(e). This criterion does not mean that the site must be in full compliance with WAC 246-272; it only requires that the site be repaired to the greatest extent possible given the site conditions. Conversely, onsite sewage systems which will serve buildings being remodeled must meet the criteria of Resolution 87-35, which requires compliance with WAC 246-272 unless the criteria for issuance of a waiver are met.
The Christiansons challenge the denial of a construction clearance permit to remodel their cabin. The Christiansons repaired their failing septic system "to the maximum extent permitted by the site" as required for failing septic sewage systems. WAC 246-272-16501(1)(e). However, when determining whether the construction clearance permit for the addition should be approved, the Hearing Examiner found that the repaired system failed to met the standards of WAC 246-272. The repaired sewage system has an inadequate setback from the lake shoreline, inadequate separation from one or more domestic water wells, inadequate vertical separation above the seasonal high water table, inadequate reserve area, and unsuitable soil conditions. The Christiansons do not dispute these findings.
Thus, the issuance of a construction clearance permit in this case depends on whether the Christiansons can meet the waiver criteria. Section 4 of Resolution 87-35 sets forth three threshold criteria for grant of a waiver. Compliance with the requirements of WAC 246-272 may be waived for existing structures (1) if the addition is compatible with and does not adversely impact the existing onsite sewage system and potential reserve area, (2) if the system is adequate to treat the onsite sewage expected to be generated over the remaining useful life of the structure and, (3) if the continued operation of the system will not adversely affect public health, surface water quality or ground water quality.
Additionally, Resolution 87-35, Section 4.B.1 lists eight interpretive factors to consider when determining whether the primary criteria have been met. These factors include:
a. location of septic tank and drainfield in relation to existing foundation and proposed improvements;
b. size of drainfield in relation to proposed use;
c. condition of existing onsite sewage disposal system;
d. useful anticipated life of the existing onsite sewage disposal system;
e. potential for reconstruction, replacement, and/or repair of the existing onsite sewage disposal system;
f. ultimate purpose of the remodeling;
g. approved source of water; and
h. potential use of the structure after remodeling.
Resolution 87-35, Section 4.B.1. The Hearing Examiner decided that none of the three threshold criteria were met in this case. He also evaluated the eight specific criteria and concluded that six of the eight factors disfavor a waiver.
*772 Turning to the three waiver criteria, the Hearing Examiner found that the addition will adversely effect the existing onsite sewage system and potential reserve area. First, the Hearing Examiner found that because the existing drainfield is so close to the shoreline there is no possible reserve area between the cabin and the shoreline. This leaves only the area south of the cabin for a reserve drainfield. The Hearing Examiner found that because the addition occupies the area south of the cabin it reduces any potential reserve area. Second, the Hearing Examiner found that the addition will adversely impact the existing system. Because the addition makes the cabin more commodious, he stated that it is reasonable to assume it will be used more, thereby, increasing sewage flows into an already substandard system. Based on these findings, the Hearing Examiner concluded that the first criterion was not met.
Regarding the second criteria, the Hearing Examiner found that the existing system is not adequate to treat the onsite sewage expected to be generated over the remaining useful life of the cabin since the repaired system is expected to fail before the cabin. Consequently, the Hearing Examiner explained that it is contrary to public health to permit an addition which may further extend the life of the structure. Based on that finding, he concluded the second criterion was not met.
As to the third criteria, the Hearing Examiner found that the continued operation of the existing system will adversely affect surface and ground water quality. He found at least three inadequacies in the present systemproximity to the lake shoreline, vertical separation above the seasonal high water table and inadequate soil typestrongly indicate the existing system will adversely affect both surface and ground water. The Hearing Examiner thus concluded the third criterion was not met.
The Hearing Examiner also analyzed the eight interpretive factors set forth in Resolution 87-35, Section 4.B.1 and found that the Christiansons property failed to met six of the eight factors.[1] First, the Hearing Examiner examined the size of the drainfield and determined that it is inadequate for existing use. He explained that since the addition will make the cabin more habitable it is reasonable to assume it will be used more, thus increasing the strain on an already inadequate drainfield. Next, he examined the condition of the existing onsite system and determined that it still fails to meet many of the WAC standards. Additionally, the Hearing Examiner considered the existing useful life of the repaired system and found that it will fail before the cabin reaches the end of its useful life.
The Hearing Examiner then considered the potential for reconstruction, replacement, and/or repair of the existing onsite disposal system. He explained that the site has been repaired to the maximum extent possible and allowing an addition that would increase the life of the structure would be contrary to public health considerations. Next, the Hearing Examiner considered the purpose of the addition and found that it was being built to improve the livability of the cabin. This, he states, will likely result in an increase in the Christiansons' use of the cabin, which will increase sewage flows. The Hearing Examiner came to the same conclusion when he considered the potential use of the cabin after the addition is built.
The Christiansons contend that the denial of their permit was not supported by substantial evidence. They assert that no evidence exists in the record supporting the Hearing Examiner's conclusion that, in light of the structural changes which make the cabin more commodious, it follows that the Christiansons will use the cabin more. They do not dispute that the addition will make the cabin more livable. Instead, they contend the Hearing Examiner erroneously relied on a presumption that a more livable cabin will result in increased use.
The record does not support Christiansons' assertion that the Hearing Examiner was merely relying on a presumption. It is apparent *773 that the Hearing Examiner was considering the specifics of the addition in this case when he determined that use of the cabin would likely increase after the addition was built. The living space was nearly doubled and the division of space indicated the strong possibility of a second bedroom.[2]
The only contradictory evidence in the record are the Christiansons' assurances that they will not increase the use of their cabin. Even with these assurances, there is substantial evidence to support the District's conclusion that an increase in size of this proportion will invite increased use.[3]
The Petitioners also argue that the District must show the addition will actually increase sewage, thereby, adversely affecting public health or water quality. However, the waiver criteria does not require the Hearing Examiner to make findings as to whether the addition will actually increase sewage. Rather, the three threshold criteria and eight interpretive factors are designed to determine whether a waiver of compliance with WAC 246-272 would adversely affect public health or water quality.
More importantly, the Hearing Examiner's findings regarding the potential for increased use of the cabin was only one of several findings which support the Hearing Examiner's decision not to grant a waiver. The current system fails to meet many of the applicable standards, the addition will compromise any potential reserve drainfield area, and the addition will increase the life of the structure which will indisputably outlast the existing septic system. These findings are not challenged by the Christiansons.
Finally, the Christiansons assert that their proposed addition poses no threat to water quality because when their repaired system fails they will be required to abandon the cabin. Since the Hearing Examiner has determined that the existing structure will already outlast the existing system, they argue it will not make any difference to build the addition. This assertion, however, carries no weight. Initially, this argument is more properly a challenge to the criteria than to the sufficiency of evidence. Additionally, the Christiansons cannot use the inadequacy of their system as an argument to further exacerbate the situation. It is only because of the special grandfather provisions for failing systems that the Christiansons are permitted to use their cabin at all. "The theory of the zoning ordinance is that [the] nonconforming use is in fact detrimental to some one or more of those public interests (health, safety, morals or welfare) which justify the invoking of the police power.... The present use of a nonconforming building may be continued but it cannot be increased...." State ex rel. Miller v. Cain, 40 Wash.2d 216, 220-221, 242 P.2d 505 (1952).
We cannot accept the Christiansons' argument that because the existing sewage system has been "grandfathered" that "it became an island surrounded by property subject to the exercise of the police power... but itself untouched." State ex rel. Miller, 40 Wash.2d at 220, 242 P.2d 505 (this court rejected the argument by a property owner that structural alterations to a grandfathered building should be allowed in spite of a Seattle zoning ordinance until the structure is determined to be a nuisance). The resolution is designed to prevent public health problems, not to abate them after the fact.
The Christiansons have have failed to establish that the Hearing Examiner's decision was not supported by substantial evidence.

*774 BURDEN OF PROOF
Next, the Christiansons assert that Resolution 87-35, as applied to their property, violates substantive due process. Before reaching the substantive due process analysis, the Christiansons raise an issue concerning who has the burden of proof regarding the constitutionality of the resolution. Clear authority provides that in a substantive due process challenge the person challenging the regulation has the burden of proof. See Margola Assocs. v. City of Seattle, 121 Wash.2d 625, 649, 854 P.2d 23 (1993). The Christiansons argue, however, that the Supreme Court's decision in Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), shifted the burden of proof to the government to show that the regulation is constitutional.
In Dolan, the Supreme Court placed the burden on the city to show that requiring the dedication of property as a condition to receiving a permit was roughly proportional to a legitimate state interest. See id. at 391 n. 8, 114 S.Ct. at 2320 n. 8. The Christiansons argue that although Dolan is a takings case, the Court's holding with regard to the burden of proof is applicable any time an adjudicatory decision is challenged. The Christiansons contend that since the District's decision was adjudicatory, relating solely to how they may use their property, Dolan shifts the burden to the District to show the regulation is constitutional.
Contrary to arguments made by the Christiansons, Dolan does not shift the burden of proof in this case. We have emphasized the problems of blurring the takings and substantive due process doctrines, stating that "[i]t is critical that these two grounds [takings and substantive due process challenges] be separately considered and independently analyzed...." See Presbytery of Seattle v. King County, 114 Wash.2d 320, 329, 787 P.2d 907 (1990).
In Dolan, the Court emphasized that the burden shifted to the city because it exacted a property interest as a condition to a permit. See Dolan, 512 U.S. at 391 n. 8, 114 S.Ct. at 2320 n. 8. The Court noted that, generally, the burden of proof will rest on the challenging party to show that a land use regulation amounts to an unconstitutional taking of property. See id. The burden shifted to the city in Dolan only because it exacted a property interest as a condition to a permit. See Dolan, 512 U.S. at 391 n. 8, 114 S.Ct. at 2320 n. 8. The Christiansons do not argue that a taking has occurred here. Moreover, they cite no authority for their sweeping assertion that Dolan shifts the burden of proof to the government in any challenge to an adjudicatory decision.
The Christiansons also point to this court's decision in Rivett v. City of Tacoma, 123 Wash.2d 573, 870 P.2d 299 (1994) to support their argument. Although the substantive due process test was applied in that case, the court did not find that the burden of proof shifted from the person challenging the regulation to the government. Petitioners also cite North Suburban Sanitary Sewer Dist. v. Water Pollution Control Comm'n, 281 Minn. 524, 162 N.W.2d 249, 32 A.L.R.3d 199 (1968). However, this case provides no support for their position as it does not involve a substantive due process challenge nor does it discuss burden of proof.
The Christiansons have the burden of proving that Resolution 87-35, as applied to their property, violates substantive due process.

SUBSTANTIVE DUE PROCESS
In Presbytery, 114 Wash.2d at 330, 787 P.2d 907, this court has adopted a threeprong test to determine whether a regulation violates substantive due process. The court must determine "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the land owner." Id. Every presumption is in favor of the constitutionality of board of health regulations, since the board of health was functioning as a legislative body when the regulations were adopted. See Ford v. Bellingham-Whatcom, County Dist. Bd. of Health, 16 Wash.App. 709, 713, 558 P.2d 821 (1977); Snohomish County Builders Ass'n v. Snohomish Health Dist., 8 Wash.App. 589, 598, 508 P.2d 617 (1973).
*775 In examining the first prong, the Christiansons concede that Resolution 87-35 is aimed at achieving a legitimate public purpose. Resolution 87-35 is aimed at protecting public health and preventing contamination of surface or ground water quality through proper disposal of sewage. This is clearly a legitimate public purpose and satisfies the first prong of the substantive due process analysis. See Ford, 16 Wash.App. at 712, 558 P.2d 821 (the promotion and protection of public health and public sanitation within the municipalities of the state constitute important and far-reaching functions of municipal government). Protection of the public health is such an important concern the Washington Constitution provides for the establishment of a state board of health to carry out its powers as the Legislature may direct. See Washington Const. art. XX, § 1. Resolution 87-35 was passed in accordance with Washington State board of health regulations.
The second question examines whether the means used are reasonably necessary to achieve the purpose. The Christiansons' argue that requiring compliance with Resolution 87-35 as a condition for all structural additions is not reasonably necessary to achieve the purpose of the resolution. They assert that this prong fails because the District cannot show that the Christiansons' addition will create or add to a public health or water quality problem by increasing sewage flows. This argument implies that the District must show the application of the regulation, in this instance, solves a presently existing water quality problem. Petitioners, however, cite no authority for their proposition that public health regulations must be so narrowly tailored.
Additionally, the court has already considered this argument. See State ex rel. Miller, 40 Wash.2d 216, 242 P.2d 505. In State ex rel. Miller, a property owner also argued that since the nonconforming use of the property had been recognized and permitted that structural alterations should be allowed although prohibited by a Seattle ordinance[4] unless the city could show that the public health, safety, morals or welfare required was at risk. See id. at 222-23, 242 P.2d 505. We soundly rejected the appellants argument in Cain and likewise do so in this case.
If courts were to consider each individual lot separate and apart from every other lot in a particular use district, and try to determine whether any given structure erected or to be erected on it is dangerous or inimical to the public health, safety, morals or welfare, there could be no successful zoning.... Upon what logic may that permission [permission to continue a non conforming use] be transferred into a right to obtain more than the ordinance gives? No one in the district may build a new store, and it would be unwarranted discrimination in favor of plaintiffs to permit them to enlarge their existing store in this residential district. The finding that the public welfare would not be endangered is beside the point.
Id. at 223, 242 P.2d 505.
We have emphasized that public policy and the intent of zoning measures are "to restrict and not to increase nonconforming uses." Coleman v. City of Walla Walla, 44 Wash.2d 296, 299-300, 266 P.2d 1034 (1954).
Consistently, zoning policy is against the indefinite extension of nonconforming uses. The public effort is not to extend a nonconforming use but rather to permit it to exist as long as necessary and then to require conformity in the future. Indeed, the public intent is the eventual elimination of nonconforming uses. It is only to avoid injustice that zoning ordinances generally except existing nonconforming uses.
Id. at 300, 266 P.2d 1034.
We have further explained:
An ordinance requiring an immediate cessation of a nonconforming use may be held to be unconstitutional because it brings about a deprivation of property rights out of proportion to the public benefit obtained, but an ordinance prohibiting the *776 enlargement of a nonconforming building is not subject to the same infirmity. This more limited restriction on the owner's rights in the use of his property is within the police power and such ordinances have been held valid.

See State ex rel. Miller, 40 Wash.2d at 222, 242 P.2d 505 (quoting Austin v. Older, 283 Mich. 667, 278 N.W. 727, 730 (1938)).
Requiring the Christiansons to comply with minimum health code regulations when building an addition is a reasonable means to protect public health and water quality. It is common for ordinances "to provide that the life of nonconforming buildings cannot be increased by structural alterations and when a change is made by the owner in the building, he must make it conform to the ordinance." Id. at 221, 242 P.2d 505. Thus, Resolution 87-35 in this instance uses a means that is "reasonably necessary" to protect the public health and water quality.
Petitioners also argue that the means used is unreasonable because it does not require a permit in other situations that may make a living space more habitable, such as, buying a television or adding a skylight. Petitioners contend that these types of unregulated improvements may also increase the comfort of the home, which would invite increased use, and, consequently, increase sewage. However, the mere existence of another means does not establish that the means chosen were not reasonably necessary. See Margola, 121 Wash.2d at 649, 854 P.2d 23. Thus, Petitioners have not satisfied their burden of proving that the District's means were not reasonably necessary to effectuate the purpose of the resolution.
The third prong examines whether Resolution 87-35, as applied to the Christiansons, is unduly oppressive. The court in Presbytery recognized that the unduly oppressive prong "will usually be the difficult and determinative one." Presbytery, 114 Wash.2d at 331, 787 P.2d 907. Courts have wide discretion in determining whether a regulation is unduly oppressive. See id. Since the police power is inherent in the effective conduct and maintenance of government, it is to be upheld even though it adversely effects the property rights of some individuals. Ford, 16 Wash.App. at 712, 558 P.2d 821. Thus, the purpose of this prong is to prevent excessive police power regulations that require the landowner "to shoulder an economic burden, which in justice and fairness, the public should rightfully bear." Orion Corp. v. State, 109 Wash.2d 621, 648-49, 747 P.2d 1062 (1987); see also Guimont v. Clarke, 121 Wash.2d 586, 610-11, 854 P.2d 1 (1993); Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 22, 829 P.2d 765 (1992); Robinson v. City of Seattle, 119 Wash.2d 34, 55, 830 P.2d 318 (1992).
In analyzing this element, the court must balance the public's interest against those of the regulated landowner. Presbytery, 114 Wash.2d at 331, 787 P.2d 907. The factors to be considered when determining if a regulation is unduly oppressive include: the nature of the harm sought to be avoided; the availability and effectiveness of less drastic protective measures; and the economic loss suffered by the property owner. See id. This court also provided a set of nonexclusive factors to aid in balancing the public's interests and those of the regulated landowner. See id. On the public side the court considers "the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant." Id. On the landowner's side, the court considers "the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses." Id.
The Christiansons rely on this court's decisions in Sintra and Guimont to support their argument that Resolution 87-35 is unduly oppressive. Sintra considered the impact of Seattle's Housing Preservation Ordinance. This housing preservation ordinance required developers who demolished or changed the use of low income housing to pay large fees to a city fund used to construct low income housing. The ordinance *777 was found to be unduly oppressive because it placed upon a discrete group of individuals and developers the responsibility of solving the society-wide problem of homelessness. This was accomplished by levying exorbitant fees, even though the developers were not responsible for the problem. See Sintra, 119 Wash.2d at 22, 829 P.2d 765. In Guimont, the court reached a similar conclusion in the context of low income mobile home owners. See Guimont, 121 Wash.2d at 611-13, 854 P.2d 1.
The present case, however, is clearly distinguishable from the above cited cases. Unlike Sintra and Guimont, in this case no fees have been imposed and the Christiansons have not been asked to "shoulder" a burden of society. This resolution holds each individual responsible for the inadequacies of his or her septic system. This obligation is required of all individuals who decide to add onto their existing homes.
The Christiansons also argue that the resolution is unduly oppressive because it singles out individuals who want to add on to their home instead of regulating actual use of a building. The Christiansons state that homeowners with inadequate sewage systems can, without consequence, increase usage from weekend recreation to full time, thus, increasing sewage production where the Christiansons are unable to build their addition even though they promise not to increase their use. This argument, however, is not persuasive because it does not create an unequal burden on the Christiansons. The Christiansons may also increase the use of their existing cabin without consequence and others with substandard septic systems may be restricted from building an addition to their home. Moreover, regulating actual use of a home would be a more oppressive method than restricting an addition.
Considering the factors set forth by the court in Presbytery, the application of Resolution 87-35 to the Christiansons is not unduly oppressive. Protecting public health and preventing contamination of ground and surface water are serious concerns. The Christiansons' substandard system creates a threat to water quality. This court has recognized that in certain cases the extent to which an owner's land particularly contributes to a public problem may be determinative. See Robinson, 119 Wash.2d at 55, 830 P.2d 318. The resolution prevents potential public health threats by preventing an addition to a structure served by a substandard system unless certain criteria are met. As noted above, other methods advocated by the Christiansons, such as regulating actual use or sewage production, would be less feasible and more oppressive. The resolution does not require the expenditure of money by the Christiansons and they may continue to use their cabin as they have in the past. Additionally, there is no reason why the Christiansons should not have anticipated the resolution's impact on their plans. Thus, the Christiansons have failed to show that the resolution is unduly oppressive. Resolution 87-35 as applied to the Christiansons does not violate substantive due process.

CONCLUSION
We affirm the decision of the Court of Appeals finding that the Hearing Examiner's decision to deny the Christiansons construction clearance permit was supported by substantial evidence and did not violate their right to substantive due process.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON and ALEXANDER, JJ., concur.
TALMADGE, Justice (concurring).
Although I concur emphatically in the result the majority reaches, I write separately to reaffirm the position I advanced in Hayes v. City of Seattle, 131 Wash.2d 706, 724, 934 P.2d 1179 (1997) (Talmadge, J., dissenting), and Sintra v. City of Seattle, 131 Wash.2d 640, 677, 935 P.2d 555 (1997) (Talmadge, J., concurring/dissenting): our land use jurisprudence requires modernizing. I would not recognize the claim of substantive due process in this case, relying instead on Armendariz v. Penman, 75 F.3d 1311, 1325-26 (9th Cir.1996): "Substantive due process analysis has no place in contexts already addressed by explicit textual provisions of constitutional protection, regardless of whether the plaintiff's potential claims under those amendments *778 have merit." The proper way to evaluate the Christiansons' claim in this case is under the takings clause of the Fifth Amendment.
This case involves the most fundamental, and perhaps least controversial, aspect of the police powerthe absolute right of society to protect and preserve public health. At least since the time of the Assyrian king Hammurabi, a person has not been able to use land in a way that causes injury to another. See Mallett v. Taylor, 78 Or. 208, 213, 152 P. 873 (1915). "The right to use all property, must be subject to modification by municipal law. Sic utere tuo ut alienum non loedas, is a fundamental maxim. It belongs exclusively to the local State Legislatures, to determine how a man may use his own, without injuring his neighbor." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 53-54, 6 L.Ed. 23 (1824). The United States Supreme Court in Munn v. Illinois, 94 U.S. 113, 124-25, 4 Otto 113, 24 L.Ed. 77 (1876), said:
When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. "A body politic," as aptly defined in the preamble of the Constitution of Massachusetts, "is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." This does not confer power upon the whole people to control rights which are purely and exclusively private, Thorpe v. R. & B. Railroad Co., 27 Vt. 143; but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and has found expression in the maxim sic utere tuo ut alienum non laedas.

In Camfield v. United States, 167 U.S. 518, 522-23, 17 S.Ct. 864, 866, 42 L.Ed. 260 (1897), the Court said:
Ever since Aldred's Case, 9 Coke, 48, it has been the settled law, both of this country and of England, that a man has no right to maintain a structure upon his own land, which, by reason of disgusting smells, loud or unusual noises, thick smoke, noxious vapors, the jarring of machinery, or the unwarrantable collection of flies, renders the occupancy of adjoining property dangerous, intolerable, or even uncomfortable to its tenants. No person maintaining such a nuisance can shelter himself behind the sanctity of private property.
"[T]he Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 492, 107 S.Ct. 1232, 1245, 94 L.Ed.2d 472 (1987).[1]
The Christiansons complain about violation of their rights but the real issue is a fundamental application of a civilized society's ancient right to protect its public health. Their claim lacks merit because such a proper public health regulation does not constitute a taking of their property.
SANDERS, Justice (dissenting).
Craig and Theresa Christianson purchased and occasionally used a small week-end cabin on Lake Bosworth to pursue that small measure of leisure life would allow. But who would have thought, when they attempted to enlarge their tiny six-by-five-foot bedroom to a still small nine-by-ten-feet (plus a small storage area), the cost would include five years of litigation at virtually every level of our state court system plus a vigorous bout with an administrative tribunal even before first setting foot in the courthouse.
*779 The record does not disclose it directly; however, by inference it seems we are dealing with citizens of modest means and a property particularly its owner does love.
And so the Christiansons come to court, claiming they have been deprived that process constitutionally due when local authorities denied them a permit to slightly enlarge their 24-by-18-foot, single story cabin on the basis that the public health would suffer if the addition were permitted.
Factually the Christiansons persist in their claim that an enlargement to their bedroom with the addition of a small storage area will imperil no one's health. The factual findings of the examiner[1] support their view.
While the majority makes much of its assertion that the hearing examiner's findings constitute the factual basis of this review (Majority at 771), the majority would do better to accurately report what these findings actually state. Compare, for example, the majority's claim that "the Hearing Examiner found that the addition will adversely impact the existing system" (Majority at 772) and the majority's claim that "the Hearing Examiner found that the continued operation of the existing system will adversely affect surface and ground water quality" (Majority at 772) with Findings 7 and 10,[2] both of which are largely cast in terms of the district's subjective state of mind,[3] and neither of which even purport to find any probable increased use of the existing system due to the proposed remodel, much less any health problem as a result thereof. Perhaps a clever turn of the examiner's phrase seduces a trusting leap of the majority's faith; however, upon closer inspection, the seemingly factual support for a public health catastrophe disappears as does the mirage.
In fact, the examiner found no increased use of the existing system after the proposed alteration, nor did he find even a hypothetical increase would cause the system to "fail"[4] any sooner than it would naturally fail even absent possible increased use. Rather, the alteration permit was denied by operation of law based on the perception that with or without the remodel the cabin would outlive the useful life of the septic tank.[5] But what reason is that to deny Christiansons a larger bedroom? That is the question.
The hearing examiner was expressly clear that remodel cause and public health effect were neither his nor the resolution's primary concern: "The basic issue presented by Christianson's appeal is whether the District acted in conformance with applicable regulations when it denied his application. In other *780 words, does the Christiansons' application meet the applicable criteria for approval?" CP at 56 (Environmental Health Hr'g Exam'r of the Snohomish Health Dist., Sanitation Appeal 92-05 Mem. (10/21/92) (Hr'g Exam'r Mem.), Conclusion 4). The examiner thus answered the threshold question in the negativethe application did not meet regulatory criteria. This conclusion was clearly correct given the regulation which made the actual effect of a remodel permit upon the public health, if any, simply irrelevant. However that is precisely the constitutional infirmity.
The Christiansons appropriately rest their claim upon that provision of the Fourteenth Amendment to the United States Constitution which provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law...."[6] They assert the State did indeed deprive them of a property interest through application and enforcement of Resolution No. 87-35 (resolution of Snohomish Health District Board of Health) which cannot pass the due process test of reasonableness as we have set it out:
The inquiry here must be whether the police power (rather than the eminent domain power) has exceeded its constitutional limits. To determine whether the regulation violates due process, the court should engage in the classic 3-prong due process test and ask: (1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.

Presbytery of Seattle v. King County, 114 Wash.2d 320, 330-31, 787 P.2d 907 (1990) (italics added).
Proper analysis should begin by recognizing "`[t]he basic rule in land use law is still that, absent more, an individual should be able to utilize his own land as he sees fit.'"[7]West Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 50, 720 P.2d 782 (1986) (quoting Norco Const. Inc. v. King County, 97 Wash.2d 680, 684, 649 P.2d 103 (1982)). And "`[a]lthough less than a fee interest, development rights are beyond question a valuable right in property.'" West Main Assocs., 106 Wash.2d at 50, 720 P.2d 782 (quoting Louthan v. King County, 94 Wash.2d 422, 428, 617 P.2d 977 (1980) (relying on Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978))). Any property owner, Christianson included, is entitled to do whatever he pleases with his land unless otherwise prohibited. Without dispute the Christiansons would be entitled to their alteration permit but for Snohomish Board of Health Resolution Number 87-35 which provides in pertinent part:
Section 2Purpose and Policy Declared These rules and regulations are enacted as an exercise of the power and duties of the Snohomish Health District Board of Health to preserve, promote and improve the public health. The provisions herein shall be liberally construed for the accomplishment of these purposes.
It is the specific intent of these rules and regulations to prevent the development of any property, to which a public sanitary sewer is not available, to such an extent or in such a manner whereby the amount of *781 any sewage produced on the property would exceed the property's ability to dispose of and treat said sewage effluent in a manner consistent with WAC 248-96.
Section 3Applicability WAC 248-96 shall apply whenever development or construction of a structure is proposed on any property to which a sanitary sewer is not available and to which water under pressure can be made available.
Section 4Remodeling; Approval required All existing buildings or structures to which additions, alterations, or improvements are made after the effective date of these policies and procedures shall be served by an onsite sewage disposal system complying with WAC 248-96; provided however, the Health Officer may waive compliance with these requirements for existing buildings or structures when additions, alterations, repairs, or improvements to the building or structure are compatible with and do not adversely impact the existing onsite sewage disposal system and potential reserve drainfield area, the system is adequate to treat the onsite sewage expected to be generated over the remaining useful life of the structure, and the continued operation of the system will not adversely effect [sic] public health, surface water quality, or ground water quality....
Resolution 87-35 (emphasis added).
The due process question posed by Christiansons is whether this resolution embodies means (permit denial) which are reasonably necessary to effectuate its purpose (protection of the public health). Of course, if the means do not even tend to rationally advance the end, it would seem the means certainly are not "reasonably necessary" to do so. If they were at least rationally related, due process would still require the means to be no broader or more extensive than necessary to accomplish the legitimate end. But here there is no rational relationship in the first instance.
This property clearly falls within the scope of the resolution as the Christiansons obviously own an existing structure which they seek to alter after the effective date of the resolution. The resolution literally applies to any existing structure sought to be altered regardless of how wonderfully its septic tank may be functioning now and forever more, and regardless of the nature of the alteration proposed (public rest room or skylight).[8] In other words, the resolution applies without regard to whether there is, or would be, any dysfunction of the septic system as a result of the alteration. It just says no.
But after virtually prohibiting any alteration, the resolution reverses its field by authorizing a waiver to this otherwise universal rule of negation upon satisfaction of the criteria listed in section 4. However, the Christiansons cannot possibly qualify for the waiver under the second "useful life" criterion. By operation of law this disqualification is not because any proposed alteration would necessarily, or even possibly, have any adverse effect upon the public health status quo but is for an entirely unrelated reason, namely their cabin will outlive their septic system. Although the majority spends great energy speculating about possible increased use of sanitary facilities should the bedroom be *782 slightly enlarged,[9] it misses the more fundamental point that such an inquiry under this resolution is entirely irrelevant because, amongst other things, the Christiansons cannot satisfy that waiver criteria which requires that "the system is adequate to treat the onsite sewage expected to be generated over the remaining useful life of the structure...." Resolution 87-35, § 4. As the examiner found (finding 7), enlarged bedroom or no, the existing structure will supposedly outlive the treatment system in any event. However, it simply doesn't matter for purposes of this resolution if the government padlocks the bathroom door, as the life of the septic system in comparison with the longevity of the house, not toilet flushing, is the point of disqualification. To qualify, the septic system must either have a longer life or the cabin a shorter one. But why is the public health preserved by remodel of a "biodegradable" shack but defeated by remodel of a stone cottage?
The majority seems to answer this question by claiming the "remaining life of the structure" criteria is an appropriate restriction on alterations to a "nonconforming use." But this cabin is not a nonconforming use, nor would it be upon remodel. The majority's discussion of the nonconforming use doctrine is quite misplaced. The cabin's "use" is single family residential in both cases, before and after remodel. Presumably this use is permitted outright by the applicable zoning ordinance, which has not changed.
State ex rel. Miller v. Cain, 40 Wash.2d 216, 217, 242 P.2d 505 (1952), upon which the majority relies, demonstrates the majority's misconception. The property owner there owned a commercial gas station which became a "nonconforming" use as a result of a city downzone of the property to residential uses only. However, even at that the applicable nonconforming use ordinance still allowed repairs, remodeling, and modernization of the nonconforming structure. Notwithstanding, perhaps banking on the perpetuation of the privileged nonconforming status, the property owner attempted to completely raze the old gas station to replace it with an entirely new gas station. However, the ordinance said no and so did the court. Continuation of an otherwise lawful use made nonconforming because of a change of use permitted in the zone would be permitted; however, substitution of an entirely new use would not. The commercial use was the "nonconforming use" which the ordinance lawfully sought to discourage, not to be confused with the manner or intensity of an otherwise conforming residential useto which the nonconforming use doctrine has no application. Compare also Coleman v. City of Walla Walla, 44 Wash.2d 296, 299-300, 266 P.2d 1034 (1954) (a fraternity house rendered nonconforming because of the change in the underlying zone from multifamily to single family residential).
In short the majority misuses the term "nonconforming use" beyond recognition. Majority at 775-776. In these cases and normal parlance the term refers to the types of uses permitted in the zoning code such as single family residential use, multifamily residential use, commercial use, industrial use, etc. See generally, Richard L. Settle, Washington Land Use and Environmental Law and Practice 48 (1983). Simply put, a nonconforming use is a use which does not conform to existing zoning because of a change in the zoning code. This cabin as is, and as proposed, conforms. The nonconforming use doctrine gets the majority nowhere.
The reason for and limits of the nonconforming use doctrine are substantively important and serve a very different purpose from legitimate regulation of ongoing harmful activities. This inapplicable doctrine does not even serve as a useful analogy. One may have a vested right to continue an otherwise lawful but now nonconforming use which results from a simple change in area zoning so as to avoid a deprivation of property without due process; however, there is no vested right to endanger the public health through continued use of a nonfunctional septic tank, zoning change or no. Hass v. Kirkland, 78 *783 Wash.2d 929, 931-32, 481 P.2d 9 (1971) ("`There is no such thing as an inherent or vested right to imperil the health or impair the safety of the community.'") (quoting City of Seattle v. Hinckley, 40 Wash. 468, 471, 82 P. 747 (1905)). In such a situation the answer is repair, replacement, or abatementnot the nonconforming use doctrinenor forcing people to sleep in small bedrooms.
The remaining two waiver criteria are met. The criterion relating to "the continued operation of the system will not adversely effect [sic] the public health, surface water quality, or ground water quality...." (Resolution 87-35, § 4) is satisfied. There was neither finding nor claim that the system would be dysfunctional as a result of the remodel.
The criteria regarding diminution of the "potential reserve drainfield area" (Majority at 773) is factually inapplicable since the examiner found the existing system as improved was the best possible for the lot; i.e., there is no further "potential." Hr'g Exam'r Mem. Finding 7. Moreover the proposed addition is uphill from the existing septic system, and even on the opposite side of the house; thus the land where it would be situated is physically unavailable to the existing septic system (if we take judicial notice that even in the Snohomish Health District water does not run uphill). Hr'g Exam'r Mem. Finding 5, Ex. 5.
Of ultimate importance is recognition that the resolution condition regarding longevity which prevents the Christiansons from obtaining a permit to enlarge their bedroom has no necessary factual, or therefore "reasonable," relationship to public health consequences of the project.
Such is the ultimate constitutional deficiency of this resolution because, insofar as it identifies a health interest of legitimate public concern, it fails to make the public health consequences of the addition or alteration the governing criteria upon which the permit will be granted or withheld. Thus it can be safely said that not only is the means not reasonably necessary to achieve the purpose, it is really irrelevant to the purpose. In consequence the resolution deprives the Christiansons of their property without due process, the resolution is therefore unenforceable, and the Christiansons are entitled to issuance of the alteration permit.
NOTES
[1] The Christiansons property satisfied two of the eight factors. The site has a proper source of water and it has an adequate distance between the existing foundation and addition to the septic tank and drainfield.
[2] There was concern at the hearing that the new area is large enough to be used as a second bedroom area. However, the Christiansons stated that the remodeling will not result in two bedrooms and that they will use that room only for storage. Also, in previous testimony the Christiansons indicated that they would eventually put in a shower in the new bathroom. Later, the Christiansons testified that they would not proceed with plans to install a shower without obtaining the necessary permits.
[3] Citing In re Indian Trail Trunk Sewer, 35 Wash. App. 840, 670 P.2d 675 (1983), Petitioners argue that they have rebutted the District's presumption with their testimonial assurances that they will not increase their use of the cabin. The inquiry, however, is whether there is substantial evidence, not whether there is controverting evidence. Sparks v. Douglas County, 127 Wash.2d 901, 904 P.2d 738 (1995).
[4] The Seattle Zoning Ordinance in question in State ex rel. Miller v. Cain, 40 Wash.2d 216, 218, 242 P.2d 505 (1952), allowed nonconforming uses to continue "provided that no structural alterations are made except such as the Superintendent of Buildings shall deem necessary for the safety of the building." (Quoting Seattle Zoning Ordinance § 9(b)).
[1] The dissent quotes from Norco Const., Inc. v. King County, 97 Wash.2d 680, 684, 649 P.2d 103 (1982) (Utter, J.), and West Main Assoc's v. City of Bellevue, 106 Wash.2d 47, 50, 720 P.2d 782 (1986) (Utter, J.): "The basic rule in land use law is still that, absent more, an individual should be able to utilize his own land as he sees fit. U.S. CONST. amends. 5, 14." Dissent at 780. No authority had ever said that before, and no court, other than Washington courts, has said it since. Nor does such a rule follow from either the Fifth or Fourteenth Amendments. In fact, that statement has never been the basic rule in land use law. As noted above, the basic rule in land use law from time immemorial has been that one's use of one's property is subject to the police power, particularly where public health is implicated.
[1] Who is John Galt.
[2] 7. The repaired system does not meet District standards for a new onsite sewage disposal system: it has an inadequate setback from the lake shoreline, inadequate separation from one or more domestic water wells, inadequate vertical separation above the seasonal high water table, inadequate reserve area and unsuitable soil conditions. Repairs to failing onsite sewage disposal systems must meet District standards "to the maximum extent permitted by the site." [WAC 246-272-030(2)] The District believes that the repair system is the best that can be obtained for the site but is also convinced that it will fail hydraulically before the cabin fails, even if the cabin is not enlarged/remodelled. When the system fails, Christiansen will have to obtain an easement for an offsite sewage disposal system or abandon use of the cabin. (Testimony)

CP at 54 (Environmental Health Hr'g Exam'r of the Snohomish Health Dist., Sanitation Appeal 92-05 Mem. (10/21/92) (Hr'g Exam'r Mem.), Finding 7 (footnote omitted)).
10. The District's denial was based on its conclusion that the site could not be brought into conformance with applicable regulations and that the addition would make the cabin more commodious, thus increasing its utility and its actual use, which in turn would increase sewage flows into a sub-standard system. (Exhibit 1 and testimony)
CP at 55 (Hr'g Exam'r Mem. Finding 10).
[3] I must confess, I didn't know it had one.
[4] Use of the term "fail hydraulically" in Finding 7 is problematic. The examiner does not tell us what this means nor does he link it in any way to usage, much less increased usage, of the system. Nor is it specified whether the predicted "failure" may be corrected by repair or maintenance. Finally it is posited as a "belief" of the District. CP at 54 (Hr'g Exam'r Mem. Finding 7). Subjective belief is irrelevant where good faith is not an issue.
[5] While it may be disconcerting to realize septic tanks, like their human creators, are not immortal, such would not seem to furnish the missing link between denial of an alteration permit on the one hand and protecting the public health on the other.
[6] The majority mentions the Takings Clause of the Fifth Amendment while acknowledging that is not really the basis of the Christiansons' claim. Majority at 774. Its discussion of Takings is therefore dicta. Further, this dissent will not discuss the "unduly oppressive" prong of the majority's analysis as I conclude the "reasonably necessary means" prong is more on point. Majority at 775-776. I would disagree, however, that undue oppression is necessarily limited only to those situations where the landowner is required "to shoulder an economic burden the public should rightfully bear." Majority at 776-777 (citations omitted). Shifting a public burden to private shoulders may also be unduly oppressive; however, this concern is more specific to the Takings Clause than to Due Process and the usual distinction should be recognized to avoid confusion. Compare Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960) (The Takings Clause is primarily designed to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").
[7] Justice Talmadge's concurring opinion questions this rule for lack of repetition. Concurrence at 772 n. 1. But perhaps some truths are so obvious they go without saying, much less repeating.
[8] There is no claim that the Christiansons' septic system, as completely replaced at a cost of $12,000, does not function appropriately in every respect as of the date of the permit application. The fact that the system conforms to historical standards, but not new standards, does not in itself demonstrate cause for concern, especially when the repaired system has been inspected and certified. In another context we have rejected the notion that "`because the world gets wiser as it gets older, therefore it was foolish before.'" Hyjek v. Anthony Indus., 133 Wash.2d 414, 418, 944 P.2d 1036, 1038 (1997) (quoting Federal Advisory Committee Note to Fed.R.Evid. 407). The hearing examiner found: "The repaired system, consisting of a new 1000 gallon septic tank, a 150 gallon pump chamber with pump, a sand filter bed and 375 sq. ft. of new pressure dosed drainfield, was installed by or on behalf of Christianson and approved by the District on August 27, 1992. (Exhibits 1 and 5)." CP at 54 (Hr'g Exam'r Mem. Finding 6). The successful repair and/or presently functioning state of the system, however, played no part in the examiner's decision, nor did the fact that Christianson began remodeling his cabin and working on his sewage disposal system prior to obtaining the required permits. CP at 56 (Hr'g Exam'r Mem. Conclusion 6).
[9] The examiner penned the following curiously worded conclusion: "The remodeling will increase use and sewage flows. Such increases into a system which the best evidence says will fail is not furthering the public health." CP at 58 (Hr'g Exam'r Mem. Conclusion 9(F)) (emphasis added). This is apparently double talk for finding "no effect" on the public health.